NOT RECOMMENDED FOR PUBLICATION
File Name: 07a0404n.06
Filed: June 18, 2007

No. 06-5625

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

          v.

DARRELL GLEN BURKE,

      Defendant-Appellant.

On Appeal from the United
States District Court for the
Western District of Kentucky
at Owensboro

_____/

**Before:**     **GUY, BATCHELDER, and GILMAN, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.**    Defendant Darrell Glenn Burke appeals his sentence, arguing that the district court erred in determining the quantity of drugs attributable to him for purposes of calculating the applicable sentencing guideline range. Defendant pleaded guilty to all 13 substantive counts charged in the Third Superceding Indictment without a plea agreement.[1] The district court sentenced defendant to a total of 151 months' imprisonment to be followed by a mandatory consecutive 60-month sentence on one of the firearm offenses, for a total term of 211 months' imprisonment. After review of the record and the arguments presented on appeal, we affirm.

**I.**

_____

[1]Counts 14 and 15 were for forfeiture, and are not at issue in this appeal.

Defendant came to the attention of the police on August 8, 2003, after the Wal-Mart in Henderson, Kentucky, reported that he and a woman made suspicious purchases of pseudoephedrine tablets and lithium batteries. A traffic stop made a short time later led to a search of defendant's truck and the discovery of, among other things, eight empty Sudafed boxes, one box containing 118 pseudoephedrine tablets removed from their blister packs, 23 lithium batteries, a small amount of marijuana, and 1.51 grams of methamphetamine. This stop would become the basis for the charges in counts 1 through 4.

On November 29, 2003, defendant was a passenger in a car stopped for speeding. The officer noticed a strong odor of ether, which is associated with the manufacture of methamphetamine, and a Sudafed box on the floor. A consensual search resulted in the seizure of, among other things, a small amount of marijuana and what the laboratory would determine to be 1.351 grams of methamphetamine. This stop would form the basis for the charges in counts 5 and 6.

In early February 2004, a confidential informant (CI) had several monitored conversations with the defendant concerning the manufacture of methamphetamine, discussing where to steal anhydrous ammonia for use in the manufacture of methamphetamine, and agreeing that defendant would teach his method for "cooking" methamphetamine. As the government noted during the sentencing hearing, defendant stated during one of these calls that his method required about 1400 pseudoephedrine pills and would yield an ounce or two of methamphetamine. Defendant added that he had been manufacturing methamphetamine for "twenty some years" without getting caught.

On March 21, 2004, police went to defendant's residence in response to an anonymous report of an active methamphetamine laboratory. Officers encountered defendant, noticed a strong odor of ether, and found materials, chemicals, and equipment associated with the manufacture of methamphetamine. Defendant's 11-year-old daughter was also present. The evidence included 400 cold tablets containing pseudoephedrine, tubing, cans of starter fluid, large bottles of drain cleaner, denatured alcohol, and rock salt. The officers also found a respirator, radio scanners, digital scales, and baggies of marijuana. Police seized a glass jar containing "pill soak" that tested positive for anhydrous ammonia, a fire extinguisher containing anhydrous ammonia, battery strippings, punctured starter fluid cans, coffee filters with white residue, and 16 hydrogen chloride (HCL) generators made from plastic soda bottles. Also, two loaded firearms, a .22 caliber revolver and a .25 caliber semi-automatic pistol, were concealed in a chair. Laboratory analysis of a solid substance weighing 45.54 grams and containing 7.75 grams of pseudoephedrine/ephedrine concluded that, if cooked, it would produce 5.03 grams of methamphetamine at a 65% yield rate. The evidence obtained on March 21, 2004, would be the basis for the charges in counts 7 through 13.

There were plea discussions under a written proffer letter, but no plea agreement was reached. Instead, defendant pleaded guilty without an agreement to two counts each of: manufacturing methamphetamine (counts 1, 5); possession of methamphetamine (counts 2, 6); possession of a "list 1 chemical" with reason to believe it would be used to manufacture methamphetamine (counts 3, 8); and possession of equipment, chemicals, and materials with

reason to believe they would be used to manufacture methamphetamine (counts 4, 9). Defendant also pleaded guilty to one count each of attempted manufacture of *5 grams or more* of methamphetamine (count 7), and possession with intent to distribute marijuana (count 13). The two seized firearms resulted in pleas for possession of firearms by an unlawful user of controlled substances, in furtherance of a drug trafficking crime, and having previously been convicted of a crime of domestic violence (counts 10, 11, and 12). All of the counts were grouped together for guideline sentencing purposes except for count 11, which carried a mandatory consecutive 5-year sentence.

The Presentence Report (PSR) calculated the base offense level to be 38, which corresponded to a drug quantity of 1.5 kilograms or more of methamphetamine. USSG § 2D1.1(a)(3) and (c)(1). Defendant objected to this determination, and argued that the base offense level should have been 22. After the sentencing hearing, the district court found that the defendant should be held accountable for an amount of methamphetamine corresponding to a base offense level of 28. Defendant does not challenge the district court's decision applying a two-level obstruction of justice enhancement and denying a reduction in the offense level for acceptance of responsibility in connection with threats made against the prosecutor and a judge. USSG § 3C1.1 and § 3E1.1(a). Nor has the government appealed from the district court's rejection of a six-level enhancement for creating a substantial risk of harm to the life of a minor—namely, the defendant's 11-year-old daughter—by exposing her to the risks associated with the manufacture of methamphetamine. USSG § 2D1.1(b)(6).

With a total offense level of 30 and a criminal history category of III, the sentencing

guideline range was 121 to 151 months' imprisonment.[2] Acknowledging the advisory nature of the guidelines, the district court imposed sentence at the top of the guideline range and commented that it had conservatively estimated the quantity of drugs involved. The district court sentenced defendant to concurrent terms of 151 months on counts 1, 3, 5, 7, and 8; 120 months on counts 4, 9, 10, and 12; 60 months on count 13; and 12 months on counts 2 and 6. To this was added the mandatory consecutive term of 60 months on count 11, for a total term of 211 months' imprisonment. Referencing 18 U.S.C. § 3553(a), the district court indicated that this aggregate sentence was sufficient to meet the objectives of punishment and deterrence. This appeal followed.

## II.

Although the sentencing guidelines are no longer mandatory, the district court must determine the guideline range as it would have prior to *Booker* and must consider the guidelines along with the other factors in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 258-59 (2005). We review post-*Booker* sentences for procedural and substantive reasonableness. *United States v. Williams*, 432 F.3d 621, 623 (6th Cir. 2005). This appeal concerns one component of procedural reasonableness—whether the district court correctly calculated the sentencing guideline range. *United States v. Davis*, 458 F.3d 491, 495 (6th Cir. 2006). Defendant specifically argues that the district court clearly erred in determining the quantity of drugs attributable to him for purposes of calculating the base offense level under USSG § 2D1.1(a)(3). *United States v. Jennings*, 83 F.3d 145, 149 (6th Cir. 1996)

---

[2]Had the total offense level been 24, the guideline range would have been 63 to 78 months.

(clear error).

The district court determined the base offense level to be 28, which corresponds to the equivalent of at least 200 but less than 350 grams of methamphetamine, or at least 20 but less than 35 grams of methamphetamine (actual), or at least 400 but less than 700 kilograms of marijuana.[3] The district court specifically found defendant was accountable for the following quantities:

1)   1.52 grams of methamphetamine (or 3.02 kilograms of marijuana) seized during the traffic stop on August 8, 2003;

2)   1.351 grams of methamphetamine (or 2.63 kilograms of marijuana) seized during the stop on November 29, 2003;

3)   5.03 grams of methamphetamine (or 10.06 kilograms of marijuana) that the laboratory estimated would result if the mixture containing pseudoephedrine found on March 21, 2004, was cooked at a yield rate of 65%;[4]

4)   24 grams of methamphetamine (or 48 kilograms of marijuana) reflecting the testimony of Beth Greenwell at sentencing that she witnessed defendant and another man manufacture 24 to 28 grams of methamphetamine (or 6 to 8 "eight balls") on March 16, 2004; and

5)   226.8 grams of methamphetamine (or 453.6 kilograms of marijuana) reflecting an estimate of the amount that would have resulted from 16 cooks associated with the 16 HCL generators found on the premises on March 21, 2004, assuming production of only ½ ounce (or just over 14 grams) of

---

[3]The term "methamphetamine (actual)" refers to the weight of the controlled substance itself in a mixture or substance. USSG § 2D1.1, Drug Quantity Table, note (B). The district court did not count any of the quantities to be actual methamphetamine, which the government points to as evidence that the district court's estimate was conservative. However, there was no evidence showing the level of purity of the methamphetamine seized or the amount of "actual" methamphetamine typically produced using defendant's method.

[4]The district court said at sentencing that the 5.03 grams of methamphetamine was equivalent to 153 kilograms of marijuana, but the government concedes on appeal that the proper equivalency was 10.06 kilograms of marijuana. One gram of methamphetamine equals 2 kilograms of marijuana, and one gram of methamphetamine (actual) equals 20 kilograms of marijuana. USSG § 2D1.1, Drug Equivalency Tables.

methamphetamine per cook (1 oz. = 28.35 grams).

Close examination of the record reveals that although defendant objected to the PSR's calculation of drug quantity, he did not dispute that he was accountable for the amounts listed in items 1 through 4 above. In fact, when these four quantities are tallied they equal 31.901grams of methamphetamine (or 63.71 kilograms of marijuana), which corresponds to a base offense level of 22. As noted earlier, defendant argues on appeal that the district court should have found the base offense level to be 22.

This leaves only item 5—the district court's estimation of the drug quantities to be attributed to defendant based on the 16 discarded HCL generators found on defendant's premises on March 21, 2004. The court must consider quantities not specified in the counts of conviction that are "part of the same course of conduct or common scheme or plan." USSG § 1B1.3(a)(2) (relevant conduct). When the amount is uncertain, the court must approximate the quantity of drugs for which the defendant is more likely than not responsible. *Jennings*, 83 F.3d at 149. The guidelines provide that in making this determination, "the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." USSG § 2D1.1, cmt. n.12. The court's determination is not clearly erroneous if it is supported by competent evidence, and the finding has "'some minimum indicium of reliability.'" *United States v. Mahaffey*, 53 F.3d 128, 133 (6th Cir. 1995) (citation omitted).

At sentencing, Detective Bill Mills testified that an HCL generator is a soft plastic

soda bottle with a tube attached to it. Salt and muriatic acid are combined in the bottle to create hydrogen chloride gas (HCL). The HCL gas is added to the jar containing the pseudoephedrine or ephedrine mixture to extract the methamphetamine. The testimony, which is unrefuted, was that one HCL generator is used per cook; that the acid degraded the plastic such that each HCL generator would ordinarily be used only once; and that, in this case, the 16 HCL generators appeared to have all been used. We find, and defendant does not argue otherwise, that the district court did not clearly err in finding that the 16 HCL generators were associated with 16 separate cooks on defendant's premises. The controversy centers instead on the quantity that was estimated to result from each of those cooks. As Detective Mills explained, and as the district court specifically recognized, the quantity produced in any given cook depended not on the HCL generator, but on the amount of pseudoephedrine or ephedrine that was used. He added that it normally takes approximately 1200 pills containing 30 mg. each of pseudoephedrine or ephedrine to manufacture one ounce of methamphetamine.

Defendant maintains on appeal that the district court improperly relied on statements he made in the plea proffer in determining what quantities to attribute to each of the cooks. The proffer letter sent to defense counsel provided that "no statements made by your client during this proffer will be used in the United States' case-in-chief against your client in a criminal case, other than in crimes of violence, unless otherwise provided for in this letter." Defense counsel objected when the prosecutor attempted to elicit the statements during the sentencing hearing, and the district court allowed the testimony while expressly reserving the

question of whether the statements would be considered at all. Detective Mills then testified that the defendant said during the proffer that he manufactured and sold one ounce of methamphetamine per month for years, and that he had produced 19 to 20 grams in cooks he did with another individual.

Defendant objected specifically on the grounds that use of the statements violated USSG § 1B1.8(a), which provides that when "a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement." By its terms, however, USSG § 1B1.8 does not restrict the use of information known to the government prior to entering into the cooperation agreement. Defendant also relies on Fed. R. Evid. 410(4), which applies to "any statement made in the course of plea discussions with an attorney for the prosecuting authority *which do not result in a plea of guilty or which result in a plea of guilty later withdrawn*." (Emphasis added.) Although no plea bargain agreement was reached, the defendant did, in fact, plead guilty. We need not decide the applicability of either the sentencing guideline or the rule of evidence because there is no indication that the district court's determination as to quantity rested on those statements.[5]

---

[5]Nonetheless, because the proffer letter purports to be a "standard" proffer agreement such that the question could arise again, the government and defense counsel may be well advised to clarify in the future what use, if any, may be made of a defendant's proffer statements for purposes of sentencing.

Aside from the proffer statements, there was evidence that the defendant told a confidential informant several times during monitored conversations that his method of cooking methamphetamine used about 1400 pills and would yield an ounce or two of methamphetamine. In addition, Beth Greenwell testified that she witnessed defendant cooking methamphetamine days before the search and that the cook produced 24 or 28 grams—roughly an ounce—of methamphetamine. Even so, the district court conservatively estimated the quantity produced in each cook to be 14 grams—or ½ ounce—of a mixture containing methamphetamine. With this determination, the district court attributed a total of 226.8 grams—or 8 ounces—of methamphetamine to the discovery of the 16 used HCL generators. The district court did not clearly err in finding that the HCL generators were likely associated with 16 separate cooks, that at least ½ an ounce of methamphetamine could be attributed to each cook, and that these quantities were manufactured as part of the same course of conduct or common scheme or plan as the offenses of conviction. As a result, we find that the defendant has not shown error in the calculation of the sentencing guideline range.

**AFFIRMED**.[6]

---

[6]The PSR recommended a higher base offense level of 38 based on the defendant's statements that he had been cooking methamphetamine for "some 20 years" without getting caught. The PSR assumed that defendant manufactured methamphetamine at a rate of three cooks of one ounce per year for each of 20 years, but the district court properly rejected these additional quantities as there was no competent evidence to support such a determination.