*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

STEVEN E. WARMAN,

　　　　　　　　*Defendant-Appellant.*

No. 05-4416

>

_____

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 03-00739—David A. Katz, District Judge.

Argued: April 23, 2009

Decided and Filed: August 18, 2009

Before: COLE and CLAY, Circuit Judges; CLELAND, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, WESTERN DISTRICT OF MICHIGAN, Grand Rapids, Michigan, for Appellant. Ava M.R. Dustin, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, WESTERN DISTRICT OF MICHIGAN, Grand Rapids, Michigan, for Appellant. Ava M.R. Dustin, Joseph R. Wilson, ASSISTANT UNITED STATES ATTORNEYS, Toledo, Ohio, for Appellee. Steven E. Warman, Morgantown, West Virginia, pro se.

_____

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

COLE, Circuit Judge.   Defendant-Appellant Steven E. Warman appeals his conviction for conspiracy to possess and distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.   He also challenges his 97-month sentence. Warman's conviction and sentence arise from his involvement in a drug-selling operation with members of the Outlaw Motorcycle Club ("OMC" or "Outlaws"), an international motorcycle club with chapters nationwide and abroad.   Following a large-scale investigation, Warman and thirty-seven co-defendants were indicted for a widespread conspiracy involving violations of the Racketeer Influenced Corrupt Practices Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and various narcotics and firearms laws.   Warman asserts that: (1) there was insufficient evidence to support his conviction; (2) the district court improperly admitted co-conspirator statements in violation of Federal Rule of Evidence 801(d)(2)(E) ("Rule 801(d)(2)(E)"); (3) he was prejudiced by an impermissible variance between the indictment and the proof at trial; (4) the district court abused its discretion by empaneling an anonymous jury; (5) the district court committed numerous other trial errors; and (6) his 97-month sentence is unreasonable. For the following reasons, we **AFFIRM** Warman's conviction and sentence.

## I.  BACKGROUND

**A.       The history of the OMC and Warman's association with the Outlaws**

Since its founding outside of Chicago in 1935, the OMC has grown to become an international motorcycle club with over 1700 dues-paying members in 176 chapters throughout the United States and in twelve foreign countries. *See* Department of Justice, *About Violent Gangs*, available at http://www.usdoj.gov/criminal/gangunit/about/omgangs.html (last visited Aug. 1, 2009). The Outlaws are reputed to engage in a number of criminal activities, including arson, assault, explosives, extortion, fraud, homicide, intimidation, kidnapping, money

laundering, prostitution, robbery, theft, and weapons violations. *Id.* According to the United States Department of Justice Gang Reports, the Outlaws have a history of secrecy and violence, and are well known for retaliating against witnesses and informants. *Id.*

In December 1997, the Toledo, Ohio office of the Federal Bureau of Investigation ("FBI") and various state law enforcement agencies initiated an investigation of the "Green region" of the OMC, consisting of club chapters in Dayton, Ohio; Fort Wayne, Indiana; Louisville, Kentucky; Indianapolis, Indiana; and Oklahoma City, Oklahoma. As a result of the investigation, in April 2003, a federal grand jury in the Northern District of Ohio returned a forty-count indictment charging thirty-eight defendants with various offenses, including RICO violations, drug-trafficking conspiracy, and firearms offenses. Warman was charged with the drug-trafficking conspiracy.

The defendants charged with RICO violations were tried separately. *See United States v. Wheeler*, No. 3:03-cr-07739 (N.D. Ohio). On July 28, 2004, at the close of the RICO trial, the government obtained a superseding indictment against thirteen defendants setting forth two separate counts. Count 1, the narcotics conspiracy charge, and Count 2, the firearms conspiracy charge, were both abbreviated versions of the narcotics and firearms conspiracy counts contained in the original indictment. Warman was again charged only with the narcotics conspiracy. Ten of the thirteen defendants charged under the superseding indictment pleaded guilty, but Warman, Rex Deitz, and Lloyd Heckman proceeded to trial together.

Evidence at the trial established that although Warman was never a member of the OMC, he had been closely associated with the Green region Outlaws for a number of years. Warman testified that after becoming acquainted with the OMC in the 1970s, he employed Outlaws at his Dayton, Ohio motorcycle shop, S&S Custom Cycle ("S&S"), and rented Outlaws several of his residential properties. Warman also owns a building that houses Eisenhauer's Tavern ("Eisenhauer's")—a popular Outlaw hang-out in Dayton—where Warman worked as a bartender. FBI Agents Larry Hawks and David Potts testified that Warman's close social and financial association with the OMC

sparked the FBI's interest in him. Although Warman claimed that he never sold drugs, a number of witnesses testified that Warman conducted narcotics transactions with Outlaws. The following comprises the key testimony relating to Warman's conviction.

*1.     James Dilts*

In early 1998, James Dilts became an FBI confidential informant in return for money to pay off drug debts and club dues he owed to Gary "Rambo" Hohn, the president of the Dayton chapter at that time. Dilts worked as a confidential informant until he left the Outlaws in 2000, and during that time he covertly tape-recorded several drug transactions and related incriminating conversations between him and other club members.

Dilts testified that he saw Warman hand Al Lawson, an Outlaw, a quarter of an ounce of cocaine at a January 31, 1999 Super Bowl party at the Dayton clubhouse. He also witnessed Warman with scales, cocaine, and plastic baggies at S&S on March 2, 1999. Dilts further testified that David Jack Hannum, an Outlaw and well-known drug supplier, told Dilts that Warman was his "partner" in the cocaine trade. Dilts also stated that on June 10, 1999, he saw Hannum hand Warman $2000 in cash, although Dilts acknowledged that he did not know the reason for the transfer. Further, Dilts testified that on August 9 and 11, 1999, he accompanied Hannum to Hannum's pottery shop, located across the street from Eisenhauer's, where he witnessed Hannum retrieve cocaine from a mold in the basement, which Hannum subsequently gave to Hohn at Eisenhauer's. Dilts also recalled that on August 21, 1999, Warman handed Hannum a plastic baggy containing white powder at Eisenhauer's.

Dilts testified that in early December 1999, Hannum told him that he and Warman had arranged to receive a shipment of cocaine from a Florida supplier. Dilts further testified that Hannum elaborated on the transaction while driving with Dilts from Dayton to Florida to attend a New Year's party, at which time he also told Dilts that he would kill informants and that he had once witnessed other Outlaws murder an informant. Hannum also said that he planned to hand his cocaine business over to Warman and another Outlaw, so he could focus on selling Vicodin and Xanax.

### 2.     *Gary Watkins*

Gary Watkins, an Outlaw, became a confidential informant for the FBI in June 2001, and was the Dayton chapter treasurer in 1998. Watkins testified that in late 1999, Hannum told him that he was planning to travel to Florida with Warman to pursue a connection to a cocaine distributor, and Watkins recalled that cocaine was "more plentiful" after the two men returned to Dayton. Watkins further stated that although he saw Warman with cocaine at both S&S and the Dayton clubhouse, he never actually witnessed Warman buy or sell any illegal drugs.

### 3.     *Greg Armstrong*

Greg Armstrong, a former member of the Indianapolis chapter and the local "enforcer"—the Outlaw responsible for organizing retaliation efforts and serving as a bodyguard for high-profile members—testified that he transported cocaine from Indianapolis to Sandusky, Ohio ten to fifteen times for then-international club president, James "Frank" Wheeler. Armstrong testified that he knew Warman and had used cocaine with him, but he explained that he never saw Warman with more than a half an ounce of cocaine at one time. Armstrong also never saw Warman sell cocaine, and he testified that he did not consider Warman to be a cocaine dealer, and that he "probably [would have] know[n] if he was . . . ." (Joint Appendix ("JA") 507.)

### 4.     *Christopher Walters*

Christopher Walters, a confidential informant, testified about statements Warman's son, Johnny Warman ("Johnny"), made to him about Warman's drug sales. Walters stated that Johnny told him that he processed cocaine for Warman and others, cutting it with cheaper materials and compressing it into the shape of a "hockey puck." (JA 514.) Walters testified that according to Johnny, Warman received one to two kilograms of cocaine at a time from a Florida supplier, that Johnny also processed cocaine for Hannum and other Outlaws, and that although Johnny and his father worked on Outlaws' motorcycles and peddled their cocaine, they would never join the OMC

because they did not want to pay the significant club dues or share a percentage of their drug-related profits.

Walters testified that after he witnessed Johnny with thirty processed "pucks" and one "brick" (kilogram) of cocaine, which he considered a large quantity, he called the Drug Enforcement Agency ("DEA") and began making controlled purchases from Johnny for DEA Agent Brent Rasor. He recalled that during one such transaction in 2002, Johnny was repairing his mother's driveway when Warman stopped by to inform Johnny's mother that he needed to talk to Johnny about a shipment that had arrived; Johnny subsequently left his mother's home for the rest of the day. Walters testified that he assumed Warman was referring to a shipment of cocaine that he needed Johnny to process. Other than that single incident, however, Walters had no direct contact with Warman, and he never saw Warman sell drugs. At trial, Warman testified that he had never met Walters but that he remembered visiting Johnny's mother's house in 2002 to ask Johnny to help him with a shipment of bike parts that had just been delivered to S&S.

### 5.     *Tracey Tipton*

Tracey Tipton, Hohn's former live-in girlfriend, testified that she used cocaine with Warman at Eisenhauer's approximately twenty times and that she had seen Warman with as much as a quarter of an ounce of cocaine at a time.

### 6.     *Jerry Bloor*

Jerry Bloor, a confidential informant and a former Outlaw, testified that although he did not know Warman well, he used cocaine with him at Eisenhauer's. He stated that he never saw Warman sell drugs and did not know Warman to be a "coke dealer."

### 7.     *Other evidence*

The government also introduced evidence seized during searches of Warman's home, S&S, and other locations. The government recovered plastic baggies containing about 3.5 grams of cocaine from a desk in Warman's home, numerous photographs of

Warman socializing with various Outlaws (including former international OMC presidents, Wheeler and Harry "Taco" Bowman), and a plaque given to Warman by the Dayton chapter for his "loyal" support. The government also seized weapons, scales, and t-shirts that Warman sold at S&S bearing the OMC's copyrighted slogan, "Snitches are a dying breed," as well as address books and related items containing the names and contact information of Wheeler and other Outlaws. Also, a search of Hannum's pottery shop resulted in the seizure of 392 grams of cocaine from plastic bags located in a mold in the basement. Warman testified that the cocaine recovered from his house belonged to a woman who had been staying with him, and that the two of them used the scales to make shipments for Warman's "mail-order vitamin business." (JA 603-04.)

## B.    Procedural history

On August 27, 2004, the jury returned a general verdict finding Warman and Deitz guilty of the narcotics-conspiracy count but acquitting Heckman on all charges. The jury also returned a special verdict attributing more than 500 grams but less than 5 kilograms of cocaine to Warman. Warman was sentenced to a term of 97 months' imprisonment and four years' supervised release.

## II. ANALYSIS

## A.    Sufficient evidence supports Warman's conviction for the narcotics conspiracy

Warman challenges the sufficiency of the evidence supporting his conviction for conspiracy to sell narcotics. The relevant question on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In making this determination, however, we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Id.*

To obtain a conviction for conspiracy under 21 U.S.C. § 846, the government must prove: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy. *Martinez*, 430 F.3d at 330-31. "[P]roof of a formal agreement is not necessary; 'a tacit or material understanding among the parties' will suffice." *Id.* (citing *United States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997)) (quoting *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). "The existence of a conspiracy 'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *Id.* (quoting *Avery*, 128 F.3d at 971). Once a conspiracy is proven beyond a reasonable doubt, however, a defendant's connection to the conspiracy "need only be slight," and a defendant's knowledge of and participation in a conspiracy "may be inferred from his conduct and established by circumstantial evidence." *Id.* (quoting *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001)).

"A conspiracy requires: '(1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)). "Drug distribution conspiracies are often 'chain' conspiracies such that agreement can be inferred from the interdependence of the enterprise. One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell." *United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). Moreover, the government must "show the willful membership of [a] defendant in the conspiracy, but the government need not prove that the defendant committed an overt act in furtherance of the conspiracy." *United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007).

For a defendant "[t]o be found guilty of conspiracy, the [government] must prove that [the defendant] was aware of the objects of the conspiracy, and that he voluntarily associated himself with it to further its objectives." *Gibbs*, 182 F.3d at 421 (quoting *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991)). The defendant 'need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement.'" *Id.* (quoting *Hodges*, 935 F.2d at 773 (quoting *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986))). "A buyer[-]seller relationship alone is not enough to establish participation in the conspiracy, but further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy." *Id.*

> We have explained that
>
> conjecture and surmise regarding what a defendant may have intended or known is insufficient to support a conviction. The government is required to present evidence of the defendant's intent, knowledge and agreement to join a conspiracy. Absent such evidence, the government's case will not succeed merely because there is something "fishy" about the defendant's conduct.

*United States v. Coppin*, 1 F. App'x 283, 291 (6th Cir. 2001) (finding evidence insufficient to sustain conviction for aiding and abetting possession of cocaine with intent to distribute where no drugs were found on defendant's person or in his vehicle and government put forth no evidence that he knew of the drug transactions at issue); *see also Gibbs*, 182 F.3d at 408 (vacating several defendants' convictions because though they sold drugs, the government put forth no evidence that they had agreed to participate in the charged conspiracy, which necessarily involved excluding outsiders).

The record contains conflicting evidence of Warman's relationship with the Outlaws. On the one hand, there is evidence that Warman was not a participant in the OMC conspiracy. For instance, Armstrong, a major player in the Indianapolis chapter, testified that "he would have known" if Warman were a drug dealer and stated that Warman was only a recreational drug user. (JA 507.) Both Tipton and Bloor corroborated Armstrong's testimony, stating that although they had used drugs with Warman many times, they had never seen him sell drugs.

Moreover, law enforcement seized only a relatively small quantity of cocaine from Warman—the 3.5 grams of cocaine FBI investigators discovered in Warman's residence—giving rise to an inference that the drugs were merely for personal use. *See, e.g.*, *United States v. Stewart*, 69 F. App'x 213, 216 (6th Cir. 2003) (noting that a small quantity of drugs implies personal consumption rather than an intent to distribute). In addition, Walters's testimony that Johnny said that he and Warman chose not to join the OMC so that they would not have to pay club dues or share profits from their drug sales arguably supports Warman's non-participation in the OMC conspiracy.

However, other evidence suggests that Warman was a significant player in the OMC conspiracy who stood to inherit the bulk of the Green region cocaine business from Hannum. As mentioned above, Dilts testified that in 1999 he observed Warman at S&S with scales, plastic baggies, and cocaine, and that at Eisenhauer's, he saw Warman give drug-filled plastic baggies to Lawson and Hannum. *See United States v. Bell*, 516 F.3d 432, 446 (6th Cir. 2008) (finding that intent to distribute could be inferred where police found scales, baggies, and other drug paraphernalia in defendant's possession). Dilts also recalled seeing Hannum hand Warman $2000 in cash at Eisenhauer's. *See Stewart*, 69 F. App'x at 216 (noting that evidence that defendant possessed a large amount of cash when apprehended supported conclusion that he intended to distribute the drugs in his possession). Dilts further testified that Hannum told him that he and Warman were partners in the cocaine trade and that the two of them regularly traveled to Florida to obtain cocaine for resale. Walters testified that Johnny told him that he regularly processed large amounts of cocaine for Warman, and that Warman and Hannum regularly purchased one to two kilograms of cocaine from a supplier in Florida to sell to customers in and around Dayton. Also, when combined with the foregoing testimony, the evidence of Warman's association with the OMC—the cocaine, OMC t-shirts, guns, plaque, and photographs seized from his house; witness testimony that he was friendly with and regularly "partied" with Outlaws at Eisenhauer's; and the fact that Warman employed Outlaws at S&S and rented properties to them—supports a finding that Warman was a member of the OMC conspiracy.

Because much of the incriminating evidence against Warman consisted of hearsay testimony from Dilts, Watkins, and Walters, which the district court admitted under Rule 801(d)(2)(E)—the co-conspirator exception to the hearsay rule—Warman's sufficiency-of-the-evidence claims largely depend on his evidentiary arguments, to which we now turn.

1.      *Although the district court erred in admitting certain co-conspirator statements under Rule 801(d)(2)(E), any error was harmless*

Warman argues that the district court erred by admitting co-conspirator statements under Rule 801(d)(2)(E)[1] over defense counsel's continuing objection. Warman claims that the statements were admitted in error because the record includes no independent corroborating evidence that: (1) Warman was a member of the OMC conspiracy; or (2) the statements at issue were made in furtherance of the conspiracy.

To admit the statements of a co-conspirator under Rule 801(d)(2)(E), a trial court must find that: (1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy. *See United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999). "We sometimes refer to this as an *Enright* finding." *United States v. White*, 58 F. App'x 610, 614 (6th Cir. 2003) (citing *United States v. Enright*, 579 F.2d 980, 986-87 (6th Cir. 1978)). The district court may "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Id*. (quoting *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir. 1979)). Whether the government made the necessary showing to meet the three foundational prerequisites is a question of fact for the district court that we review for clear error. *See United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998) (citing *United States v. Breitkreutz*, 977 F.2d 214, 218 (6th Cir. 1992)). However, we review the court's ultimate legal

---

[1] Rule 801(d)(2)(E) states:

(D) *Statements which are not hearsay*. A statement is not hearsay if- [. . . ]
(2) *Admission by party-opponent*. The statement is offered against a party and is [. . .]
(E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2)(E).

conclusion regarding admissibility de novo. *Id.* (citing *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir. 1994)).

When district courts consider the prerequisites for admissibility of evidence under Rule 801(d)(2)(E), "a mere conclusory statement will not always suffice." *United States v. Curro*, 847 F.2d 325, 329 (6th Cir. 1988) ("An appellate court is not the proper forum to conduct the needed factual hearing required under [*Enright* and *Vinson*]."); *see also Martinez*, 430 F.3d at 328 (affirming the admission of testimony under Rule 801(d)(2)(E) and noting that though the district court's *Enright* findings were "not as specific as we might prefer," they "were not akin to the nonexistent or completely conclusory rulings" previously found to be objectionable). We have even remanded when a district court makes no *Enright* findings at all. *See United States v. Conrad*, 507 F.3d 424, 431 (6th Cir. 2007) (holding that the district court's failure to make *Enright* findings prejudiced defendant); *United States v. Mahar*, 801 F.2d 1477, 1494-95 (6th Cir. 1986) (finding that the court's failure to make the required *Enright* findings was an abuse of discretion); *United States v. Castro*, 908 F.2d 85, 91 (6th Cir. 1990) ("It is error for the trial court to have failed to make the required *Enright* determination."). However, "[d]espite this [C]ourt's stated preference for specific *Enright* findings, even conclusory findings have been upheld when the [C]ourt could conclude with confidence that the government met its burden." *Martinez*, 430 F.3d at 328 (citing *United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993)); *see also United States v. Gonzalez*, 501 F.3d 630, 636-37 (6th Cir. 2007) ("The central issue . . . is not the depth of the district court's analysis, but rather its correctness.").

In the face of defense counsel's continuing objections at trial, the district court conditionally admitted the following statements under Rule 801(d)(2)(E):

- Dilts's testimony that Hannum told him that Warman was his partner in the cocaine trade;

- Dilts's testimony that Hannum told him he planned to cut off Al Lawson from selling methamphetamine and cocaine, and that he and Warman were going to buy a major shipment of cocaine from a dealer in Florida;

- Dilts's testimony that Hannum said that he would kill informants and told him that he had witnessed Outlaws slash an informant's throat and throw the body over a bridge;

- Dilts's testimony that Hannum told him that he planned to turn over his cocaine sales to Warman and another Outlaw;

- Watkins's testimony that Hannum told him that Warman was his partner in cocaine trafficking;

- Watkins's testimony that Hannum told him that he and Warman intended to travel to Florida to bring back a large shipment of cocaine; and

- Walters's testimony that Johnny said that Warman obtained one to two kilograms of cocaine at a time from a dealer in Florida.

(Warman Br. 26-28.)  The district court later admitted all of the statements and ruled as follows, outside the presence of the jury:

> [I]n light of multiple objections by the defendants, and based on many cases,  . . . , I feel that it is time to put in the record a ruling on admissibility of hearsay under [F]ederal [R]ule of [Evidence] 801(d)(2)(E).   Under [R]ule 104(a) of the [F]ederal [R]ules of [Evidence], the preliminary determination of a conspiracy is to be made by the court based on a preponderance of the evidence standard, thus to permit out-of-court statements by co-conspirators during the course of and in furtherance of the conspiracy to be introduced into evidence under the 801(d)(2)(E) exception to the hearsay rule.
>
> The guilty pleas of several co-defendants in this case, the admissions made to the conspiracies involved not only in this case but in the prior case, those admissions made during plea hearings of defendants in this case, the evidence from the first trial, and the evidence in this case, even though hearsay, it can be considered, established to my satisfaction under the preponderance of proof that conspiracies existed as alleged in Counts 1 and 2 of the superseding indictment.
>
> Of course, the issue remaining is whether each of these defendants was a knowing and willing member or participant of one or both conspiracies.  But that is an ultimate question for the jury under the beyond-a-reasonable-doubt standard.  At this stage of the trial, under 801(d)(2)(E), hearsay statements made during the course and in furtherance of the conspiracies are admissible as exceptions to the general hearsay rule.  Thank you.

(JA 438-39.)

In stating that whether the defendants were "knowing and willing" members in the conspiracy was a "question for the jury under the beyond-a-reasonable-doubt standard," the district court misread the requirements of *Enright*. (JA 439.) On the question of admissibility, the *court* is tasked with making specific findings on each of the Rule 801(d)(2)(E) elements with respect to the contested statements. *Enright*, 579 F.2d at 986-87. Here, the court found that a conspiracy existed, but neglected to rule on the other two prongs of the analysis.

We addressed a similar circumstance in *Conrad*, where the district court "[d]id not find that the government had proven the three requisite elements by a preponderance of the evidence, but rather made the generalized finding that a prima facie case of conspiracy had been presented." *Id.* There, we remanded for a new trial because the district court's admission of the statements was not harmless. *Id.* Also, in *Martinez*, we stated that when a district court fails to make the requisite 801(d)(2)(E) findings, the proper course is a remand, unless the reviewing court can "conclude with confidence that the government [] met its burden." 430 F.3d at 328.

Warman does not dispute the existence of an OMC conspiracy, but he argues that the foregoing testimony should have been excluded because the government failed to establish, and the district court failed to find under *Enright*, that Warman was a member of the conspiracy, and that the statements at issue were made in furtherance of it.[2] We consider his arguments below.

> a.    *The government met its burden of showing that Warman was a member of the conspiracy*

Warman argues that evidence from the first trial may not be considered as independent corroboration of his participation in the OMC conspiracy. Neither Rule 801(d)(2)(E) nor its accompanying notes explicitly defines the sources of evidence that may support an *Enright* finding. We have explained that the amount of independent evidence required "is not merely a scintilla, but rather, enough to rebut the presumed

---

[2]Warman also claims that the admission of testimony under Rule 801(d)(2)(E) violates his rights under the Confrontation Clause, but our precedent is clear that such statements are not testimonial, and their admission does not violate the Confrontation Clause. *See Martinez*, 430 F.3d at 328-30.

unreliability of the hearsay," *see United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir. 1994), but we have never specified the allowable "sources" of such evidence. Nonetheless, along with other circuits, we have broadly interpreted "independent evidence" as allowing the use of circumstantial evidence. *See Payne*, 437 F.3d at 545 (finding that circumstantial evidence was sufficient to establish defendant's membership in the conspiracy); *see also United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995) (defining "independent evidence" as simply "evidence other than the proffered [co-conspirator] statements themselves"); *United States v. Miller*, 981 F.2d 439, 442 (9th Cir. 1992) (noting that though there must be "some evidence" aside from the proffered co-conspirator statement to establish that a defendant was a member of a conspiracy, a court may "consider the corroborating evidence in light of the co-conspirator's statement itself") (internal citations omitted).

The government presented the following evidence of Warman's membership in the conspiracy:

- Dilts's testimony that he saw Warman with cocaine, baggies, and scales at S&S in 1999;

- Dilts's testimony that he saw Warman hand Al Lawson a quarter of an ounce of cocaine at a Super Bowl party at the Dayton clubhouse in 1999;

- Dilts's testimony that in 1999, he saw Warman give Hannum a plastic baggy containing white powder while at Eisenhauer's;

- A plaque seized from S&S recognizing Warman for "supporting" the local Outlaws chapter;

- T-shirts seized from S&S and Warman's residence reading "Snitches are a dying breed" and "Support your local Outlaws";

- Photographs of Warman with various powerful Outlaws, *i.e.*, Wheeler and Bowman, seized from Warman's residence;

- Scales seized from Warman's residence;

- Walters's testimony that he saw Warman tell Johnny that he needed him to "process" a "shipment" Warman had just received; and

- Testimony by other Outlaws and their associates that Warman used drugs with them and was closely associated with the OMC.

Taken together, the above evidence, especially when considered with the testimony of Warman's co-defendants regarding the OMC conspiracy as well as the incriminating statements by Dilts and Walters, is sufficient to show Warman's membership in the conspiracy. *See United States v. Payne*, 437 F.3d 540, 545 (6th Cir. 2006) (finding that defendant's membership in the conspiracy was sufficiently corroborated by independent evidence that went beyond the scope of the statements at issue). Thus, even though the district court failed to explicitly make the finding, we can "conclude with confidence" that sufficient independent evidence showed that Warman was a member of the OMC conspiracy. *See Maliszewski*, 161 F.3d at 1007.

> b.     *The government met its burden of showing that all but two of the statements at issue were made in the course of or in furtherance of the conspiracy*

Warman also argues that the statements by Dilts, Watkins, and Johnny about Warman's participation in the conspiracy were not "in furtherance" thereof. Although we conclude that certain statements by Hannum implicating Warman as his partner in the cocaine trade can be construed as "bragging" or "idle chatter" that were not made in furtherance of any conspiratorial objectives, the majority of the statements occurred in the course of the conspiracy.

"A statement is 'in furtherance of' a conspiracy if it is intended to promote the 'objectives of the conspiracy.'" *United States v. Henderson*, 307 F. App'x 970, 977 (6th Cir. 2009) (quoting *Clark*, 18 F.3d at 1342). We have found statements to be in furtherance of a conspiracy where they "'identify other co[-]conspirators and their roles,' apprise other co[-]conspirators of the status of the conspiracy, or indicate 'the source or purchaser of controlled substances.'" *Id.* (quoting *United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989) (collecting cases)). Moreover, a statement may be in furtherance of a conspiracy "even if not exclusively, or even primarily, made to further the conspiracy." *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (internal citations omitted). On the other hand, "mere idle chatter or casual conversation about past events is not considered a statement in furtherance of the conspiracy." *See United States v. Darwich*, 337 F.3d 645, 657 (6th Cir. 2003); *see also United States v. Hamilton*,

689 F.2d 1262, 1270 (6th Cir. 1982) (holding that statements need not "actually further" the conspiracy so long as they were "intended to" do so).

Whether a statement was in furtherance of a conspiracy turns on the context in which it was made and the intent of the declarant in making it. *See Conrad*, 507 F.3d at 431 (finding that "the district court erred in failing to make the requisite findings regarding the context and timing of [the co-conspirator's] out-of-court statement before admitting [the] testimony"). For instance, in *Darwich*, we found that statements by the defendant's nephews about the amount of marijuana they had packaged the previous evening were not made "in furtherance" of the conspiracy, because they were informal exchanges with the defendant about "the work" they had done the night before: "[T]hese statements are simply casual conversation of how hard the nephews worked on a particular evening – and, other than the illegal nature of the work, are no different than a statement by a farmer that he harvested forty acres of wheat by sundown." 337 F.3d at 658. Other courts have similarly interpreted strictly the "in furtherance" requirement to limit the evidence admitted under Rule 801(d)(2)(E). *See also United States v. Cornett*, 195 F.3d 776, 784 (5th Cir. 1999) (finding prejudicial error in admission of statements implicating defendant made during a conversation at a bowling alley regarding "such diverse issues as the bowling prowess of certain friends and relatives, the appearance of some of the patrons at the bowling alley, the merits of certain designer outfits and the respective talents of certain exotic dancers"); *United States v. Mitchell*, 31 F.3d 628, 632 (8th Cir. 1994) (holding that a statement that "simply informs a listener" of speaker's criminal acts does not satisfy the in-furtherance requirement); *United States v. Urbanik*, 801 F.2d 692, 698-99 (4th Cir. 1986) (finding prejudicial error in admission of statement identifying defendant as a marijuana connection, which was "merely a casual aside" while defendant and co-conspirator lifted weights together).

Here, the district court erred in admitting the following two statements because both were mere idle chatter or bragging in the context of a casual conversation. First, the court erred in admitting the following testimony by Dilts:

> **Government:**  Tell us about David Jack Hannum.  How did you meet him?
>
> **Dilts:**  I met him at the clubhouse when I was trying to become an Outlaw, and he had just gotten his patch back, and he was an Outlaw.
>
> **Government:**   Did you have any conversations with him early on concerning drugs?
>
> **Dilts:**  Yes, I had several conversations with David Jack about drugs.
>
> **Government:**  And in 1998 do you recall anything he might have told you about his drug dealing?
>
> **Dilts:**  He told me he sold a lot of cocaine, a lot of methamphetamine, and that he had a partner in the cocaine trade.
>
> **Government:**  Did he tell you who his partner was in the cocaine trade at that time?  . . . .
>
> **Dilts:**  He said his partner was Steve Warman.

(JA 412-13.)   The district court also erred in admitting the following testimony by Watkins:

> **Government:**  And Mr. Hannum indicated that he and Mr. Warman were partners in [S&S], correct?
>
> **Watkins:** Yes, he did.  He also said they had interest in other things too.
>
> **Government:** Did he indicate what those other things were?
>
> **Watkins:** Upon occasion David Jack would tend to be rather boisterous, and he would brag about his financial holdings.  And on one occasion, maybe more, he indicated that he and Warman had gone to the Gulf to make a drug connection.  And at that time I learned that he and Mr. Warman were heavily involved in the drug trade; in particular, cocaine.

(JA 470-71.)

There is no indication that Hannum made either of these statements in an attempt to induce Dilts or Watkins to participate in the OMC conspiracy or that he was providing information that would assist them in carrying it out.  Watkins even characterized Hannum's statements as "bragging."  *United States v. Brown*, 221 F.3d 1336, at *8 (6th Cir. 2000) (Table) ("[M]ere boasting is not 'in furtherance of' a conspiracy.") (citing

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1012 (6th Cir. 1999)).  Further, the government failed to elicit the context in which these statements were made.  *See Conrad*, 507 F.3d at 431 (finding error where the district court failed to make a determination as to the timing or the context of the statement at issue: "For all this Court knows, [co-conspirator's] statement could have been made after he was arrested and the conspiracy had ended or was mere 'idle chatter.'") (internal citation omitted).  Under these circumstances, we cannot "conclude with confidence" that the above statements were made in furtherance of the conspiracy.

However, the same is not true of the other statements at issue.  The statement that Warman stood to inherit the bulk of the Green region cocaine business resembles the statements in *Henderson*, where a confidential informant identified the defendant's role in a drug distribution chain that began with a dealer in Georgia.  307 F. App'x at 975.  There, we found that because the statements identified the source of the controlled substances, they were made "in furtherance" of the conspiracy.  *Id.* at 977; *see also United States v. Blakeney*, 942 F.2d 1001, 1021 (6th Cir. 1991) (noting that a defendant's statement identifying another co-conspirator as a source of narcotics meets the in-furtherance requirement).  Because the statements at issue informed Dilts and Walters about from whom they could acquire cocaine, they were made in furtherance of the OMC conspiracy.  *See id.*; *see also United States v. Mooneyham*, 473 F.3d 280, 286 (6th Cir. 2007) (finding that where a co-conspirator's statement is "directed at a potentially recurring customer . . . with the intention of reassuring him of defendant's reliability as a supplier," the statement is in furtherance of the conspiracy).

> c.     *The district court's erroneous admission of two co-conspirator statements was harmless*

While this Court has held that "[t]he erroneous admission of a statement by an unindicted co-conspirator constitutes harmless error when sufficient other evidence demonstrates a defendant's active involvement in the conspiracy," *United States v. Young*, 553 F.3d 1035, 1047 (6th Cir. 2009), this definition is imprecise.  As the Supreme Court has held, "[i]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial

rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see also United States v. Rayborn*, 491 F.3d 513, 518 (6th Cir. 2007) ("'The harmless[-]error standard calls for reversal when the appellate court lacks a fair assurance that the outcome of the trial was not affected by evidentiary error.'") (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005)). The harmless-error test is "highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected . . . and the centrality of that issue to the ultimate decision . . . ." *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988) (holding that error was not harmless in a "close case" where the inadmissible testimony was arguably the strongest evidence at trial weighing in plaintiff's favor) (internal citations omitted); *see also United States v. Pugh*, 405 F.3d 390, 401 (6th Cir. 2005) ("In determining whether an error is harmless, the reviewing court must take account of what the error meant to the jury, not singled out and standing alone, but in relation to all else that happened.") (internal citations omitted).

Warman argues that the erroneous admission of statements under Rule 801(d)(2)(E) prejudiced him and denied him a fair trial. Because of the importance of co-conspirator testimony to the instant case, that might have been true if *all* of the challenged statements were inadmissible, rather than just two of them. Because the other statements by Dilts and Walters about Warman's trips to Florida with Hannum and Hannum's professed intent to turn his cocaine business over to Warman were admissible, and because significant circumstantial evidence showed that Warman had a close relationship with key Outlaws involved in the conspiracy, we can say with fair assurance that the jury's verdict was not substantially swayed by the erroneously admitted statements.

### 2.      *Conclusion*

Having determined which evidence was properly admitted, we must proceed to ask whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Martinez*, 430 F.3d at 329 (quoting *Jackson*, 443 U.S. at 319). Absent the testimony by Dilts, Watkins, and Walters admissible under Rule 801(d)(2)(E), identifying Warman as a major player in the OMC conspiracy, this would be a close case. Nonetheless, given our conclusion that the district court's admission of the testimony was proper—with the exception of the aforementioned two instance of harmless error—sufficient evidence supports Warman's conviction.

**B.      There was no prejudicial variance requiring the reversal of Warman's conviction**

Next, Warman claims that because the proofs at trial established multiple drug conspiracies rather than the single narcotics conspiracy charged in the indictment, we should reverse his conviction. We review the question of whether such a variance occurred de novo. *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008).

When the government prosecutes more than one conspiracy under a single indictment and at a single trial, the resultant variance is error. *See Kotteakos*, 328 U.S. at 757; *see also United States v. Hughes*, 505 F.3d 578, 587 (6th Cir. 2007) ("The concept of variance is designed to prevent the prosecution from convicting the defendant of a different offense, not a lesser variation on the charged offense."); *United States v. Caver*, 470 F.3d 220, 235-37 (6th Cir. 2006). This error requires reversal only if it prejudices the defendant by transferring "guilt to an individual defendant involved in one conspiracy from evidence incriminating defendants in a conspiracy in which the particular defendant was not involved." *United States v. Levine*, 569 F.2d 1175, 1177 (1st Cir. 1978); *see also Hughes*, 505 F.3d at 587. Therefore, to obtain a reversal of his conviction based on a variance, a defendant must (1) demonstrate the variance, and (2) show that the variance affected a substantial right. *See Hughes*, 505 F.3d at 587; *United States v. Bouquett*, 820 F.2d 165, 168 (6th Cir. 1987) (holding that a substantial right is affected if the defendant shows prejudice to his ability to defend himself or to the overall fairness of the trial).

The indictment charged Warman with conspiracy to possess and distribute cocaine through his "membership in and participation in the [OMC]." (JA 344-45.)

Warman asserts, however, that the government's evidence "at best, showed several disconnected conspiracies," such as:

- The cocaine conspiracy among Wheeler, Hohn, Dilts, Watkins, and others;

- Hannum's alleged cocaine conspiracy with Warman and Lawson;

- Watkins's and  Heckman's alleged methamphetamine conspiracy;

- Warman's alleged cocaine conspiracy with Johnny and another dealer;
  and

According to Warman, the government failed to establish any connection among the foregoing conspiracies that warranted prosecuting him under a single conspiracy count.

"The principal considerations to determine the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). "Whether single or multiple conspiracies have been established is usually a question of fact to be resolved by the jury . . . and [is] to be considered on appeal in the light most favorable to the government." *Id*. (quoting *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir. 1988)). "Even if an appellant can demonstrate that a variance resulted in guilt transference, typically any danger of prejudice can be cured with a cautionary instruction to the jury that if it finds multiple conspiracies, it cannot use evidence relating to one conspiracy in determining another conspiracy." *Hughes*, 505 F.3d at 587 (citing *United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006)).

At trial, the district court properly instructed the jury on the issue of multiple conspiracies, providing:

> To convict any one of the defendants of a conspiracy charge in the superseding indictment, the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment.  If the government fails to prove this, then you must find that defendant was not guilty of the conspiracy charge, even if you find that he or she was a member of some other conspiracy.  Proof that a defendant was a member of some other conspiracy not charged in the superseding indictment is not enough to convict.

But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government also proved that he was a member of the conspiracy charged in the indictment . . . .

To prove a single conspiracy, the government must convince you that each of the members agreed to participate in what he knew was a group activity directed toward a common goal. There must be proof of an agreement on an overall objective.

But a single conspiracy may exist even if all the members did not know each other, or never sat down together, or did not know what roles all the other members played. And a single conspiracy may exist even if different members joined at different times, or the membership of the group changed . . . .

(JA 606-08.) In light of this instruction, any potential error caused by trying multiple conspiracies under a single indictment did not influence the fairness of Warman's trial. The government presented significant evidence of Warman's continued close association with the OMC, and several witnesses testified about Warman's efforts to deal cocaine with Hannum, his son Johnny, and others. A reasonable jury could have found that although Warman might not have known *all* of the other individuals dealing drugs as part of the OMC conspiracy and *all* of the conspiratorial objectives, he used his close association with the Outlaws to pursue illegal narcotics transactions. *See United States v. Robinson*, 547 F.3d 632, 642-43 (6th Cir. 2008) (finding that even if the evidence proved multiple conspiracies, there was no prejudice where the government proved defendant's involvement in at least one of them). Because Warman has failed to demonstrate that any variance between the indictment and the proof prejudiced the outcome of his case, we need not determine whether a variance existed. *See United States v. Osborne*, 545 F.3d 440, 443 (6th Cir. 2008).

**C.      The district court's decision to empanel an anonymous jury did not violate Warman's Sixth Amendment right to a fair trial**

The district court granted the government's motion to empanel an anonymous jury in Warman's trial, adopting its reasoning for doing so in the earlier trial of the RICO defendants, where it explained:

The indictment in this case alleges numerous acts of violence and obstruction of justice. The government's memorandum sets forth a litany of activities of the "Green" region of the OMC which amply justify the conclusion that an anonymous jury is necessary . . . . Of extreme importance in the Court's consideration of the issues is the statement made at the pretrial conference held December 31, 2003. Assistant U.S. Attorney Joseph Wilson, speaking at the beginning of the pretrial conference when all counsel for defendants were in attendance (which portion of the conference was held *in camera*), reported as follows:

> In December 2003, the FBI received information from a confidential informant that certain defendants in this case were contracting to arrange the murders of witnesses, court officers and prosecutors. This information was corroborated by subsequent investigation by the FBI. The investigation into these threats is ongoing.

That statement demonstrates the "propensity" of the defendants, or at least some of them and/or the OMC itself, to go to extremes in intimidation, which intimidation cannot be permitted to be directed at jurors. The fear of such actions, based upon reliable information provided to the FBI and confirmed by investigation, would in itself justify the Court granting the government's motion.

(*United States v. Wheeler* (Doc. No. 783), JA 1209-12.) The district court also noted that other courts had previously recognized the OMC's history of violence and jury tampering. (JA 1210 (citing *United States v. Bowman*, 302 F.3d 1228 (11th Cir. 2002) (upholding empaneling of anonymous jury in case against Harry Bowman, the former international president of the OMC)).)

A district court may empanel an anonymous jury in any case in which the interests of justice so require, 28 U.S.C. § 1863(b)(7), and that decision "is within the sound discretion of the trial court." *United States v. Lawson*, 535 F.3d 434, 439 (6th Cir. 2008) (affirming conviction and sentence of a RICO defendant in *United States v. Wheeler*) (quoting *United States v. Talley*, 164 F.3d 989, 1001 (6th Cir. 1999)). In *Talley*, we upheld the district court's decision to empanel an anonymous jury where evidence showed that defendant had previously manipulated the justice system and threatened to kill a witness. 164 F.3d at 1001-02. We explained:

> The anonymity of the jury should be preserved in cases: (1) with very dangerous persons who were participants in large scale organized crime, and who participated in mob-style killings and had previously attempted to interfere with the judicial process; (2) where defendants have had a history of attempted jury tampering and serious criminal records; or (3) where there have been allegations of dangerous and unscrupulous conduct by the defendant, coupled with extensive pretrial publicity . . . In deciding to empanel an anonymous jury, the court must ensure that the defendant retains his or her right to an unbiased jury by conducting "a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself," and by providing the jury a neutral and non-prejudicial reason for requiring that it be anonymous, so that jurors will refrain from inferring that anonymity was necessary due to the character of the defendant.

*Talley*, 164 F.3d at 1001-02 (quoting *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991)).

Warman argues that the district court's decision to empanel an anonymous jury over Warman's objection was an abuse of discretion, warranting the reversal of his conviction. We disagree. The record shows that anonymity was appropriate as a safety precaution and as a means to avoid potential interference with the jury's ability to function. First, the record provides extensive evidence that Warman, Deitz, and Heckman were members of, or closely associated with, the OMC, an organization with a long history of crime and violence. *See Talley*, 164 F.3d at 1001-02; *see also United States v. Doe*, 63 F.3d 121, 130 (2d Cir. 1995) ("The problem of retaliatory acts against those producing adverse testimony is especially acute in the context of criminal organizations . . . ."). Second, prior to trial, the government put forth testimony by an informant who overheard Warman talking in prison about seeking to harm the prosecutors involved in his case and the presiding judge. *Talley*, 164 F.3d at 1001-02. Third, the defendants faced lengthy sentences upon conviction, increasing the likelihood that they would resort to extreme measures to influence the outcome of their trials. *See id.*; *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1035 (11th Cir. 2005) (considering fact that defendant faced a "lengthy sentence if convicted" to support the district court's decision to empanel an anonymous jury). Therefore, the district court's decision to empanel an anonymous jury was not an abuse of discretion.

Although the parties did not raise the issue, we will also *sua sponte* consider whether the district court erred in explaining to the jury the reason for its anonymity. When empaneling an anonymous jury, the district court must provide the jurors with a "neutral" and "non-prejudicial" explanation. *Talley*, 164 F.3d at 1002. Both this Court and several other circuits have held that the need to protect the jury from unwanted publicity is an appropriate explanation. *See id.* (finding proper the court's explanation to jurors that they would be anonymous to prevent unwanted media contact); *see also United States v. Marrero-Ortiz*, 160 F.3d 768, 776 (1st Cir. 1998) (same); *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir. 1985) (same); *compare United States v. Scarfo*, 850 F.2d 1015, 1025-26 (3d Cir. 1988) (finding appropriate judge's statement to jurors that they would remain anonymous to ensure that they would not be influenced either by fear of retaliation by defendants or by media attention).

Here, the district judge explained to the jury: "Because of the unusually large number of prospective jurors in this multi[-]defendant criminal trial, and to ensure a fair trial, the Court has directed that the jurors will be anonymous." (JA 379.) While it is always a preferred practice for a district judge to be as clear and accurate as possible in providing the reasons for using an anonymous jury, and this statement differs from the protection-from-media-attention explanation typically given, in an appeal by one of the OMC-defendants from the first trial, we found an identical explanation to be sufficiently neutral and non-prejudicial. *See*, *e.g.*, *Lawson*, 535 F.3d at 440 ("The court provided the jurors with a neutral, non-prejudicial reason for requiring their anonymity by telling them that anonymity was required by the unusually large number of prospective jurors."). Therefore, the court's explanation to the jury was not an abuse of discretion.

**D.     Other asserted trial errors do not warrant reversal of Warman's conviction**

> *1.     The district court's admission of certain "background" statements violated the Confrontation Clause but did not amount to reversible plain error*

Warman's numerous evidentiary challenges also do not require reversal. Warman contends that the district court should not have admitted testimony by Dilts and FBI Agents Hawks and Potts about their investigation of the OMC because the testimony relating tips by informants violated the Confrontation Clause of the Sixth Amendment. Specifically, Warman objects to the admission of the following testimony:

- Dilts's statement that he cooperated with the FBI, in part, because Hohn wanted to "have relations" with Dilts's wife;

- Agent Hawks's testimony that Dilts told him that Warman was an associate or supporter of the Dayton chapter and employed Outlaws at S&S;

- Agent Hawks's discussion of various Outlaws' roles in selling drugs, based upon "information he had developed" from various cooperators and informants;

- When asked about the various individuals the FBI identified as distributors of narcotics to the OMC conspiracy, Agent Hawks named Warman;

- Agent Potts's incorrect identification of Warman as being a member of the Outlaws at the time of the FBI's investigation;

- Agent Potts's testimony that because an informant had tipped the FBI that Louisville Outlaws often picked up cocaine in Dayton and drove it back to Louisville for distribution, his office surveilled Louisville Outlaws during the 1990s; and

- Dilts's testimony that Hannum told him that he had witnessed Outlaws slit an informant's throat before disposing of his body by throwing it off a bridge. Specifically, Dilts testified that Hannum told him that when he was riding in a vehicle with a suspected informant, "one of the passengers in the back seat pulled his head back, and the other passenger beside him cut his throat." (JA 434.)

We generally review the district court's evidentiary rulings for abuse of discretion, *Pugh*, 405 F.3d at 397, but we review Confrontation Clause challenges de novo. *United States v. Powers*, 500 F.3d 500, 504 (6th Cir. 2007). The only challenged

statement to which Warman objected at trial was Agent Hawks's statement that Dilts had cooperated because Hohn wanted to have relations with Dilts's wife.  Because Warman objected to the admission of this statement, harmless-error review applies, calling for "reversal when the appellate court lacks a fair assurance that the outcome of the trial was not affected by evidentiary error.'" *Rayborn*, 491 F.3d at 518 (quoting *McCombs*, 395 F.3d at 358).  We review the other foregoing statements for plain error; thus Warman must show: (1) error, (2) that "was obvious or clear," (3) that "affected defendant's substantial rights," and (4) that "affected the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008); *see also Puckett v. United States*, 129 S. Ct. 1423, 1425 (2009) (setting forth standard for plain-error review).

The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature and must be hearsay—that is, a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007) (citing Fed. R. Evid. 801(c)).

We have held that a statement is testimonial where a reasonable person would anticipate that his or her statement would later be used "against the accused in investigating and prosecuting the crime."  *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).  Moreover, in *Cromer*, we held that "statements of a confidential informant are testimonial in nature, and therefore[,] may not be offered by the government to establish the guilt of an accused absent an opportunity for the accused to cross-examine the informant."  *Id*. at 670-71.  However, evidence that is "provided merely by way of background" or is offered only to "explain[] how certain events came to pass or why the officers took the actions they did," is not offered for the truth of the matter asserted.  *Id*. at 676; *see also Gibbs*, 506 F.3d at 486-87 (finding no *Crawford*

violation because the challenged testimony "[d]id not bear on" any element of the charges against defendant and "was a miniscule part of [the witness's] overall testimony"). Accordingly, where the testimony at issue did not bear on any element of the charges against Warman, its admission was not in error.

Applying the above framework to the testimony at issue, the admission of Agent Hawks's testimony as to why Dilts became an informant and why Warman came to the attention of the FBI in its investigation of the OMC, as well as Agent Potts's testimony as to the surveillance of Outlaws traveling between Louisville and Dayton was not in error. First, because Dilts testified at trial, defense counsel had an opportunity to cross-examine him about his statements regarding Hohn's interest in his wife. Second, Dilts's testimony that Hannum told him about witnessing the murder of an informant was admissible under Rule 801(d)(2)(E).[3]  Hannum is a co-conspirator, and because the statement involves the Outlaws' alleged murder of an informant, it is in furtherance of the conspiracy. *See United States v. Bonds*, 12 F.3d 540, 573 (6th Cir. 1993) (holding that statements about an act of retaliation recounted by a gang member were made in furtherance of the conspiracy). Third, Agent Potts's identification of Warman as a "member" of the Outlaws at the time of the FBI's investigation did not violate the Confrontation Clause because the declarant, Agent Potts, was not referring to the testimony of an out-of-court declarant and was subject to cross-examination at trial. *See Crawford*, 541 U.S. at 53-54. Finally, although the remaining statements at issue may be testimonial in nature, they were not offered for the truth of the matter asserted, but rather, merely to provide background about the FBI's investigation of the OMC and Warman. Because they do not go to the heart of the government's case against Warman, they do not violate the Confrontation Clause. *See Gibbs*, 506 F.3d at 487 (finding agent's statement admissible because it was offered "solely as background evidence to show why [defendant's] bedroom was searched").

---

[3]Warman also objects to the admission of Dilts's testimony about witnessing an informant's throat being slashed as improperly admitted under Rule 801(d)(2)(E). This objection was preserved because the district court construed Warman's 801(d)(2)(E) objections as "continuing" objections. (*See* JA 434.) However, as explained above, the statement was made by a co-conspirator in furtherance of the conspiratorial objective of retaliation against informants, so its admission was proper.

Agent Hawks's statement identifying Warman as a supplier of narcotics to the conspiracy is different because the statement bears directly on the elements of the charges against Warman and are testimonial. *See Cromer*, 389 F.3d at 675; *Pugh*, 405 F.3d at 400 (district court's admission of an out-of-court identification of defendants violated their rights under the Confrontation Clause). The statement goes "to the very heart of the prosecutor's case" against Warman—namely, it is offered to identify Warman as a participant in the OMC conspiracy. *See Cromer*, 389 F.3d at 677; *Pugh*, 405 F.3d at 400 (district court's admission of an out-of-court identification of defendants violated their rights under the Confrontation Clause). Nonetheless, because Warman did not object to the admission of Agent Hawks's statement at trial, plain-error review applies. *See Vonner*, 516 F.3d at 386.

Although the admission of the statements violated the Confrontation Clause, and, by extension, meets the first two prongs of plain-error review—(1) error (2) that "was obvious or clear"—the ample evidence introduced by the government of Warman's participation in the conspiracy makes it unlikely that the challenged statements affected either Warman's substantial rights or the fairness of the judicial proceedings. The testimony of Dilts, Walters, Watkins, and others provided strong evidence to support the jury's conclusion that Warman bought and sold large quantities of drugs. This is especially true in light of the drugs, scales, drug paraphernalia, and OMC-related items recovered from Warman's home. *United States v. Lowe*, 172 F. App'x 91, 98 (6th Cir. 2006) ("Here, the fact that [defendant] possessed the bags of cocaine, their quantity, the fact that they were divided up in convenient sale-sized packages, the scale, the presence of firearms, and the fact that a witness stated that she [had bought drugs from defendant] . . . is sufficient for a jury to infer that defendant possessed the [drug]s with the intent to distribute [them].").     Accordingly, we see no reasonable possibility that the government's in-court reference to agent Hawks's above-mentioned statement swayed the jury such that their admission warrants reversal of his conviction. *See United States v. Jones*, 205 F. App'x 327, 342 (6th Cir. 2006) (concluding that where there was overwhelming evidence of defendant's involvement in conspiracy, erroneous admission

of one portion of the officer's testimony repeating a CI's statements implicating defendant did not prejudice defendant).

### 2.     *The admission of the foregoing testimony did not violate Federal Rule of Evidence 403*

We must also consider Warman's argument that regardless of whether the above evidence violated the Confrontation Clause, it was irrelevant and inflammatory in violation of Rule 403 of the Federal Rules of Evidence ("Rule 403"), which provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Under Federal Rule of Evidence 401 ("Rule 401"), "[r]elevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. We have explained that "[t]he relevance and probative value of 'investigative background' is often low, but the potential for abuse is high." *Martin*, 897 F.2d at 1372 (citing *McCormick on Evidence* § 249, 734 (3d ed. 1984)); *see also Bonds*, 12 F.3d at 574 ("In looking at the disputed evidence, we must maximize its probative value and minimize its prejudicial effect; we cannot reverse the district court's admission merely because we might have excluded the evidence if faced with the decision at trial.") (internal citation omitted).

As a threshold matter, because we found that Agent Hawks's identification of Warman as a supplier of drugs to the Outlaws conspiracy violated the Confrontation Clause, we need not address whether the statement was also inadmissible under Rule 403. As for Agents Hawks's and Potts's other statements contested on appeal, we find them relevant insofar as they explained the reason for the government's investigation of Warman and certain Outlaws, and they were not unduly prejudicial in that they were merely cumulative of the substantial evidence offered at trial linking Warman to the OMC conspiracy.

However, of greater concern is the inflammatory nature of Dilts's testimony that Hannum told him about witnessing the murder of an informant. At trial, the prosecution elicited testimony from Dilts about the Outlaws' regular policies and practices in retaliating against informants. Following defense counsel's relevancy-based objections, the court admitted the testimony but instructed the jury that it should only consider the evidence "to support the government's position on a general conspiracy. And within that conspiracy, the threat to or fulfillment of threats with regard to those who are believed to be or proven to be government informants." (JA 434.)

Because defense counsel raised a relevancy objection under Rule 401 rather than the Rule 403 objection Warman now brings on appeal, he has forfeited his prejudice argument, and plain-error review applies. *See Vonner*, 516 F.3d at 386. Although statements about an informant being executed by having his throat slit is arguably inflammatory, this testimony was merely cumulative of many details the jury heard throughout the trial about the OMC's history of and propensity toward violence against witnesses and informants. Further, the district court sought to minimize any prejudice to Warman by directing the government to omit the vivid details of such violence and related activities. *See, e.g.*, *United States v. Myers*, 280 F.3d 407, 414 (4th Cir. 2002) (noting that court minimized prejudice by not allowing government to show inflammatory photographs of body or bloody scene). Accordingly, no plain error occurred.

### 3. *There is insufficient evidence for us to consider Warman's ineffective-assistance-of-counsel claim*

In a pro se addendum, Warman asserts that he received ineffective assistance of counsel. "As a general rule, a defendant may not raise ineffective-assistance-of-counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations." *Martinez*, 430 F.3d at 338. We have "routinely concluded that such claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on this issues." *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997). We cannot assess the merits of Warman's claim on the

record before us. Accordingly, we dismiss the claim to allow Warman to raise it in a post-conviction proceeding under 28 U.S.C. § 2255, should he choose to do so.

    *4.     Warman's cumulative-error claim is without merit*

    Warman also asserts that, when viewed together, the numerous errors he alleges require us to reverse his conviction. Under cumulative-error analysis, "a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (where defendant failed to identify any error to combine with an incident of harmless error, defendant could not show that he was "denied a fundamentally fair trial"). "That is so because errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair." *Id.*

    As explained above, the admission of the two statements by Hannum identifying Warman as his partner in the cocaine trade was harmless error, and the admission of the testimony by Agent Hawks directly identifying Warman as an Outlaw and a drug dealer was non-prejudicial plain error. However, because all of the testimony in question was independently corroborated by admissible evidence presented at trial showing Warman's participation in the OMC conspiracy, even when combined, these errors do not prejudice Warman such that we must reverse his conviction.[4]

---

[4] This Court has not directly addressed the issue of how (if at all) to incorporate into a cumulative-error analysis, plain errors that do not, standing alone, necessitate reversal. Some circuits combine all non-reversible errors (*i.e.*, harmless errors and plain errors failing to necessitate reversal) into a cumulative-error analysis. *See, e.g.*, *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005); *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008) (explaining that "the defendant may not be able to establish prejudice from the cumulation of all the unpreserved errors, but factoring in the preserved errors may be enough for the defendant to satisfy his burden of showing prejudice"). In contrast, other circuits appear to review separately any cumulative plain errors. *See, e.g.*, *United States v. Necoechea*, 986 F.2d 1273, 1283 (9th Cir. 1993) (noting that "we review the cumulative impact of the possible plain errors for plain error"). Here, we need not decide whether to consider harmless and plain errors together or separately because Warman's cumulative-error claim fails regardless.

**E.     Warman's sentence is procedurally and substantively reasonable**

Finally, Warman challenges the imposition of his 97-month sentence as "excessive."  Warman asserts that the district court erred by adopting the Presentence Investigation Report ("PSR")'s recommendation that he be attributed with 4.48 kilograms of cocaine, yielding a Base Offense Level of 30.  He contends because 4369.55 grams (approximately 97.5% of the total) was based on the hearsay testimony of Walters and Hannum, the court's reliance on these amounts at sentencing violated his rights under the Confrontation Clause.

*1.     Standard of review*

We review challenges to the district court's sentencing determinations for reasonableness under an "abuse-of-discretion standard." *Gall v. United States*, 128 S. Ct. 586, 594 (2007); *United States v. Booker*, 543 U.S. 220, 261 (2005).  The reasonableness inquiry has both procedural and substantive components. *Caver*, 470 F.3d at 248.  Accordingly, "[w]e must 'consider not only the length of the sentence but also the factors evaluated and the procedures employed by the district court in reaching its sentencing determination.'" *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) (quoting *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005)).

Warman does not specify whether his argument is procedural or substantive in nature.  To the extent that Warman challenges the drug quantity attributed to him, the reliability of the information before the district court, or the calculation of the Guidelines, we treat his claim as one of procedural unreasonableness. *United States v. Burke*, 243 F. App'x 69, 71 (6th Cir. 2007) (citing *United States v. Davis*, 458 F.3d 491, 495 (6th Cir. 2006)).  To the extent that Warman asserts that his 97-month sentence is excessive, we will construe his claim as one of substantive unreasonableness. *See United States v. Olan-Navarro*, 350 F.3d 551, 554 (6th Cir. 2003).

2.    *Warman's sentence is procedurally reasonable*

When reviewing a sentence for procedural reasonableness, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *Gall*, 128 S. Ct. at 597. "Our 'reasonableness review focuses on the factors listed in § 3553(a), one of which is the Sentencing Guidelines themselves.'" *Moon*, 513 F.3d at 539 (quoting *United States v. Duckro*, 466 F.3d 438, 442 (6th Cir. 2006)).

We may conclude that a sentence is unreasonable when the district court "fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *Moon*, 513 F.3d at 539 (citing *United States v. Jones*, 489 F.3d 243, 250-51 (6th Cir. 2007)). The § 3553(a) factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the appropriate advisory guideline range; (5) any other pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

*Caver*, 470 F.3d at 248 (quoting 18 U.S.C. § 3553(a)). Although the district court need not "engage in a ritualistic incantation" of the § 3553(a) factors, its opinion should be "sufficiently detailed to reflect the considerations listed in § 3553(a)" and to allow for meaningful appellate review. *Moon*, 513 F.3d at 539 (citing *United States v. McBride*, 434 F.3d 470, 474 (6th Cir. 2006)). "The district court's opinion must also provide some

indication that the court considered the defendant's arguments in favor of a lower sentence and the basis for rejecting such arguments." *Id*. (citing *Jones*, 489 F.3d at 250-51).

Warman argues that the district court erred in determining the amount of cocaine attributable to him, and, by extension, the applicable Guidelines range. The amount of cocaine attributable to Warman is a factual finding that this Court normally reviews for clear error. *United States v. Samuels*, 308 F.3d 662, 670 (6th Cir. 2002) (citing *United States v. Jenkins*, 4 F.3d 1338, 1345-46 (6th Cir. 1993)). However, because Warman did not object to the district court's reliance on the hearsay statements at sentencing, we review his claim for plain error. *See Vonner*, 516 F.3d at 386.

"A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice . . . ." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). "[T]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004) (quoting *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)). The drug quantity estimate "errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *Anderson*, 526 F.3d at 326. Given our previous findings that both the hearsay testimony of Walters, accounting for 3977.55 grams, and the 392 grams of cocaine found in Hannum's pottery shop were properly admitted at trial, Warman's argument fails.

*3.      Warman's sentence is substantively reasonable*

In addition to procedural reasonableness, we must determine that a sentence is substantively reasonable. *Webb*, 403 F.3d at 383. A sentence may be substantively unreasonable "where the district court select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553(a) factors or giv[es] an unreasonable amount of weight to any pertinent factor." *United States v. Tate*, 516 F.3d 459, 469 (6th Cir. 2008) (citing *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006) (alteration in original) (internal quotation marks omitted)). Sentences

within a properly calculated Guidelines range are afforded a rebuttable presumption of reasonableness. *Caver*, 470 F.3d at 247 (citing *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006)). Because Warman's sentence falls within the advisory Guidelines range, it is entitled to a rebuttable presumption of reasonableness. *Id*.

Warman asserts that his sentence is unreasonably "excessive" but he fails to offer any support for that claim. Given that Warman does not identify any particular factors that the district court did not consider, his argument amounts to nothing more than a "bald assertion that the district court should have reached a different conclusion." *United States v. Wright*, No. 07-4085, 2009 WL 1444433, at *7 (6th Cir. May 26, 2009). Regardless, the record also clearly shows clear that the district court did not select Warman's sentence arbitrarily, base it on impermissible factors, or give unreasonable weight to any pertinent § 3553(a) factor in deriving it. *See Tate*, 516 F.3d at 469. Thus, Warman has failed to rebut the presumption that his sentence is substantively reasonable.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.