**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0572n.06

**No. 09-1566**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Aug 30, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| STANLEY THOMAS BRAZIL, JR. | ) | |
| Defendant-Appellant. | ) | O P I N I O N |
| | ) | |
| | ) | |

**BEFORE:** COLE and McKEAGUE, Circuit Judges; MAYS, District Judge.[*]

**McKEAGUE, Circuit Judge.** Following investigations in 2005 and 2007 of drug trafficking by the Sunnyside Gang in Saginaw, Michigan, prosecutors obtained guilty pleas from and convictions against numerous gang members. Stanley Brazil, Jr., one of the gang leaders, who was convicted and sentenced to serve two concurrent 380-month terms, now appeals both his conviction and his sentence. We affirm.

**I.**

Over the course of several years the Sunnyside Gang sold crack cocaine on the South Side (or "Sunnyside" area) of Saginaw, Michigan. In 2005, the government arrested, indicted, and convicted several gang members, and in 2007 launched a second wave of investigations. This second wave ultimately resulted in the November 14, 2007, indictment of ten individuals, including Brazil. The superceding indictment charged Brazil with: (1) conspiracy to distribute and possess

---

[*]The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

with intent to distribute fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); (2) together with Willie Floyd Jackson distributing and aiding and abetting in the distribution of fifty grams or more of cocaine base on September 13, 2007, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii) and 18 U.S.C. § 2 (Count 19); (3) together with Kevin Stephens distributing and aiding and abetting in the distribution of fifty grams or more of cocaine base on October 1, 2007, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii) and 18 U.S.C. § 2 (Count 21). On September 15, 2008, the day before trial, the government moved to dismiss Count 1 of the superceding indictment, the charge of conspiracy, in order to "narrow the issues presented at trial and conserve judicial resources."

Brazil's trial began on September 16, 2008. The prosecution's first witness, called on September 17, was Detective Sergeant Scott L. Woodard of the Michigan State Police. Woodard testified that as of September 13, 2007, he had been assigned to the Bay Area Narcotics Enforcement Team (BAYANET) to investigate drug conspiracy crimes in Saginaw, Michigan. Along with Michigan State Trooper Neal Bryant Sommers and ATF Agents Tom Bowden and Paul Wade, he had worked to set up "controlled purchases" of narcotics from Brazil by the government's confidential informant, Thomas Dancey. Woodard testified that on September 13, 2007, the date of the first controlled purchase, he first searched Dancey to make sure that Dancey was not carrying money, weapons, or narcotics, and then gave Dancey a digital audio recorder and $2,500 to buy drugs from Brazil. Woodard and his team kept Dancey under surveillance while Dancey walked back to his house; Dancey then met up with his brother, who was unaware of Dancey's participation in the controlled purchase, and Dancey's brother drove Dancey to meet Brazil. Following this

meeting, Woodard retrieved the recording device from and again searched Dancey. Five hours later, as Woodard watched with a video camera, Brazil drove to Dancey's apartment in a pickup truck and Willie Jackson emerged from the passenger seat. Jackson and Dancey then walked up the stairs into Dancey's apartment, where they remained for five minutes. Once Jackson left, Woodard and his team searched Dancey, and retrieved a baggie of crack cocaine.

Over the course of several days near the end of September 2007, at the encouragement of the investigators, Dancey repeatedly called Brazil to try to set up another drug purchase. According to Woodard, Dancey left a message indicating: "Hey, get with me. I want you to sell me that car for $3,000. You know that car that you have." (Trial Tr. I:39.) Over a defense objection, the district court then permitted Woodard to testify that Dancey "told [him] that Mr. Brazil did not have a car for sale, but that was street language or code for $3,000 worth of drugs. His explanation for that was in case someone was listening to the conversation, he did not want them to know it was a drug transaction." (*Id.* at 40-41.) The following day, the district court announced that it had concluded that this testimony was inadmissible, and the court issued a limiting instruction to the jury stating that they should not consider it.

Woodard testified that the October 1, 2007, controlled purchase proceeded in roughly the same fashion as had the September 13 purchase: the ATF agents searched Dancey and then gave Dancey $3,000. Woodard then conducted surveillance of the store in Saginaw where Brazil had directed Dancey to meet him. Woodard took several pictures of Brazil's truck driving into the store parking lot. After ten minutes, Dancey and his brother drove away from the parking lot, and Woodard met up with Dancey to again search him. Woodard found that Dancey was not carrying

any drugs, and no longer had the money. Woodard then testified that he continued to monitor the situation by police radio as Dancey met with Brazil again, and that the two ATF agents picked Dancey up following the meeting. (Other prosecution witnesses, including Bowden and Wade, testified regarding the drug delivery portion of the October 1 controlled purchase.)

On cross-examination, Woodard testified that Dancey had approached the police with the idea of targeting Brazil, and that he knew that Dancey had bad feelings against Brazil. Woodard conceded that he had not searched Dancey's brother on September 13, nor had he searched a neighbor with whom Dancey spoke briefly before meeting Jackson and Brazil at his apartment. Woodard also admitted that he suspected that Dancey was selling drugs on the side even while working with the police, and that he confronted Dancey in May of 2007, but ultimately decided to pay Dancey more money for each controlled purchase so that Dancey could afford to live. Dancey was ultimately paid between $50 and $300 for each purchase.

The prosecution's second witness was Sommers, the state trooper who, along with Woodard, was also assigned to BAYANET at the time of these controlled purchases. Sommers testified that he had helped keep Dancey under surveillance during the September 13 controlled purchase, and that he had watched Dancey, driven by Dancey's brother (the "unwitting party"), go to meet Brazil at Brazil's house ("3200 Flamingo"). On cross-examination, Sommers clarified that on September 13 he had seen Willie Jackson get out of the passenger side of a pickup truck and go into Dancey's apartment. Sommers then saw Dancey leave his residence and briefly meet with his neighbor before bicycling off to meet Woodard.

The prosecution's third witness was Bowden, the ATF agent leading the team investigating the Sunnyside Gang. Bowden testified that as part of this investigation he had worked closely with Dancey, who had made a total of 40 controlled purchases from April 3, 2007, through October 3, 2007. Bowden explained that on the morning of September 13, 2007, he had identified a car belonging to a girlfriend of Brazil's outside of 3200 Flamingo. He then told Woodard and Sommers to contact Dancey and set up a controlled purchase from Brazil. Bowden testified that, as it was a long distance from Dancey's residence ("1623 Hess") to 3200 Flamingo, which was in a suburb of Saginaw, the investigators agreed that (to avoid raising suspicions) it would be best to have an "unwitting individual" (Dancey's brother) drive Dancey. Also to avoid arousing Brazil's suspicions, Bowden explained, the investigators had been putting out a story that Dancey had received $35,000 as a legal settlement after bringing a lawsuit based on being harmed while working with asbestos.

Bowden confirmed that on September 13, 2007, the investigators met with and searched Dancey, gave Dancey the money, and then tracked Dancey as Dancey and his brother drove to Brazil's house. Dancey spent approximately nine minutes in Brazil's house, and then Dancey and his brother drove to a gas station. Bowden and Sommers set up surveillance at Dancey's house to wait for the drug delivery. While waiting, Bowden had Dancey call Brazil four times to check to see that the delivery was going to take place; those calls were taped, and were introduced at trial. Bowden testified that he saw Brazil and Jackson drive up, and Dancey come outside and meet with Jackson. Once Brazil and Jackson left, Bowden added, he saw Dancey leave the house, talk to two nearby individuals, and then get on his bike to meet with Woodard. Bowden testified that he was able to keep visual contact with Dancey "one hundred percent from the time he exited the apartment

to the time he met up with us at the road commission." (*Id.* at 101.) According to Bowden, Dancey came no closer than 3-4 feet from the first individual he spoke with after leaving his house; Bowden saw the second individual hand Dancey a slip of paper. When Bowden and the others searched Dancey, they retrieved a bag containing approximately two and a half ounces of cocaine base.

Bowden also testified at length regarding the October 1 controlled purchase. That morning, Dancey met with law enforcement and was searched and provided with an audio recorder and $3,000 of buy money. Dancey then again received a ride from his brother, who was still an unwitting participant, to meet with Brazil. Following the meeting, Dancey returned home to 1623 Hess, where Bowden again searched him. At this point, Dancey received a call from Brazil, and learned that he was supposed to pick the drugs up at "the Dub," which was the nickname for 3275 South Washington. For this delivery, Dancey wore an audio-visual recorder; the resulting recording was also shown to the jury. The video shows Brazil wiping off a plastic baggie with his shirt, and insisting that the bag contains the correct number of ounces. After Dancey returned from the Dub, he handed the police approximately 71 grams of cocaine base.

In addition to testifying about the two controlled purchases, Bowden testified extensively about his relationship with Dancey, about Dancey's role in the investigation, and about the BAYANET team's concerns when they learned in May of 2007 that Dancey was engaged in unauthorized side drug deals. Ultimately, the team confronted Dancey. As Bowden later testified:

> Initially, Mr. Dancey was very nervous and upset. After speaking to him for about ten minutes, he calmed down and provided full information.
>
> He stated he had made several deals with three individuals, and identified them either by name or nickname. He stated he had been doing so during the time period shortly

> after a controlled purchase we had made from one of those individuals . . . . He described on those occasions he acted either as a middle man or would sometimes feel compelled to purchase crack cocaine in order to document the cover story that he had put out at our instruction that he was, quote, back in the game, end quote, and was back into selling cocaine, powdered cocaine and crack cocaine.
>
> And he stated the most amount he had ever purchased was approximately $150 worth and he did so on . . . six different occasions.

(Trial Tr. II:19-20.) Bowden stated that the government was able to make cases against Dancey's sources, but determined that, due to a lack of evidence, they could not prosecute Dancey himself. Instead, Bowden testified, the investigators sought to exercise greater control over Dancey: they incorporated a second informant to monitor Dancey, and decided to provide Dancey with more money per controlled purchase.

On cross-examination, after ascertaining that Dancey had been the one to approach law enforcement about the possibility of working on controlled purchases, Brazil's attorney then raised an entrapment defense, alleging (without admitting that Brazil had committed a crime) that Brazil would never have engaged in any criminal activity had the police not sought to entrap him. Brazil's attorney specifically suggested to Bowden that Dancey was angry at Brazil, and was possibly also attempting to take down members of the Sunnyside Gang as part of a drug turf war. Having raised this defense, Brazil opened the door for the government to demonstrate that Brazil was predisposed to commit the crime of drug trafficking. Brazil's attorney acknowledged as much, stating: "I know I've opened up the door to other information that the agent may have about Mr. Brazil and drug dealing." (*Id.* at 56.) On redirect, Bowden in response testified regarding the investigations into the Sunnyside Gang and, to some extent, Brazil's role in that gang.

During a break in Bowden's testimony, the prosecution called two police crime lab drug analysts, who testified that the substances recovered from Dancey following the controlled purchases were 60 grams and 68.1 grams of cocaine base respectively. Following Bowden's testimony, the prosecution called Michigan State Police Detective Sergeant James Young, who testified regarding his enhancement of the video presented at trial. Young's testimony ended the second day of trial.

On September 19, 2008, the third day of trial, the government called Willie Floyd Jackson, who had already pled guilty to his involvement in the September 13, 2007, controlled purchase.[1] Jackson, who at the time of the trial was 55 and who had recently suffered a stroke, testified that he met Brazil in the early 1990s, when he started purchasing crack cocaine from Brazil. Jackson testified that "off and on in the early nineties to 2007," he worked as Brazil's live-in help, a job he took over from Dancey. Jackson stated that on September 13, 2007, he saw Dancey come out to the house at 3200 Flamingo and meet with Brazil, and that then later that day Brazil drove him over to Dancey's house and told him to give Dancey a brown paper bag containing what he thought was some crack cocaine. Jackson testified that he went into Dancey's house and gave Dancey the bag, and then went out to the porch, eventually followed by Dancey. After a short conversation, Jackson added, Dancey directed Jackson to go back inside and, as a gift, take some crack cocaine from a bag Dancey had hidden behind the toilet.[2]

_____

[1]Just before Jackson testified, in accordance with the Jencks Act, 18 U.S.C. § 3500, the government provided Brazil with information about Jackson, including the full transcript of an interview between Jackson and Bowden on September 15, 2008, the day before trial.

[2]The prosecution then sought to impeach its own witness by asking Jackson whether he had changed his story between meeting with Bowden to discuss the case on June 19, 2008 and meeting

On cross-examination, Jackson testified that he had received cocaine from Dancey "a lot of times," and that on September 13, Dancey gave him cocaine that "wasn't the same" as the cocaine that Jackson had just delivered. Jackson also stated that, in the two months before the September 13 delivery, he had been at Dancey's apartment and seen "some" cocaine there. On the day of the September 13 delivery, Jackson added, he was actually going to Dancey's house anyway because Dancey had invited him to party. Jackson explained that, in exchange for his testimony, he might receive a five-year sentence instead of a mandatory minimum ten years in prison.

Following Jackson's testimony, the prosecution called Roxie Burton to testify (in response to Brazil's raising of the entrapment defense) to Brazil's predisposition to engage in drug trafficking. Burton had previously pled guilty to a drug trafficking charge, and was serving a sentence of 180 months. Burton, who was 29 years old, testified that he had known Brazil since he was 14 or 15, and that he had been purchasing "from small quantities to large quantities" of crack cocaine from him every couple of days since that time in order to resell. Eventually, Burton stated, he was buying and selling from four to nine ounces of cocaine (worth between $2,800 and $5,500) at a time from Brazil. (Burton was later recalled for additional cross-examination, and again testified that he had purchased significant amounts of cocaine from Brazil.)

---

again with Bowden on September 15, 2008. Jackson agreed that at the June 19 meeting he never mentioned receiving cocaine from Dancey, and at the September 15 meeting he for the first time made this claim. On redirect, the prosecution again tried to show that Jackson was lying when he stated that Dancey had given him crack cocaine. After listening to the audio recording from Dancey's apartment, Jackson agreed that he asked for cocaine, and that Dancey had not simply offered any. Jackson continued to maintain that Dancey had provided him with drugs.

As its final witness, the prosecution called ATF Agent Paul Wade, who testified to assisting with the September 13 and October 1 controlled purchases. Wade stated that he had encouraged Dancey to make the phone calls to Brazil on September 27 and 28, 2007, attempting to set up the October 1 controlled purchase. Wade then testified regarding that controlled purchase: he stated that he had been with Dancey before and after both the buy and the drug delivery, and that he had either searched or witnessed the search of Dancey before the purchase, after the purchase, and after the delivery. Wade also testified that, while waiting with Dancey after the purchase but before the delivery, he heard part of a phone conversation in which Brazil, on the other end of the line, told Dancey to go to a house where Dancey eventually received the drugs. Wade described for the jury one of the prosecution's exhibits, which was a still picture of Brazil, who "appears to be holding something through his T-shirt, a white sandwich bag and the crack cocaine." (Trial Tr. III:122-23.) On cross-examination, Wade confirmed that at various points the ATF agents lost sight of Dancey during the controlled purchase, but that Dancey was wearing an audio-visual recorder at those times.

Brazil called no witnesses of his own. The jury began its deliberations on September 22, 2008, and the following day delivered its verdict, finding Brazil guilty on Counts 19 and 21 of the superseding indictment. Following the jury verdict, the district court on September 23, 2008, signed an order granting the government's motion to dismiss Count 1.

Prior to trial, the government had indicated that it was seeking a penalty enhancement under 21 U.S.C. § 851 on the basis of Brazil's 1998 state conviction in Michigan for possession of under 25 grams of cocaine. In preparation for sentencing, Brazil filed an objection to the use of this conviction as a penalty enhancement on the grounds that such use would constitute double jeopardy.

Brazil also filed a sentencing memorandum objecting to various points in the Presentencing Investigation Report (PSR) prepared by the United States Probation Office. The combined weight of crack cocaine involved in the two counts upon which Brazil was convicted was 128.12 grams. The PSR, however, in addressing Brazil's relevant conduct and taking into account a synopsis of proffers from five cooperating defendants (Thomas Dancey, Demetrious Robinson, Terry Burt, Roxie Burton, and Robert Louis Bell), recommended holding Brazil responsible for a total of 14.201 kilograms of powder cocaine and 13.312 kilograms of cocaine base. In his memorandum, Brazil challenged this calculation, and also challenged both the use of the prior conviction to enhance his penalty and the recommendation in the PSR that the court apply a two-level Sentencing Guidelines increase on account of Brazil's leadership role. Brazil filed a supplemental memorandum arguing that the court in sentencing him was violating his rights to a jury trial and against double jeopardy.

The district court held a sentencing hearing on April 13, 2008, and continued the hearing on April 19, 2008. Over the course of these two days, the court heard extensive testimony from Bowden regarding information Bowden had received from the cooperating defendants about Brazil's history of drug trafficking. Ultimately, the court denied Brazil's sentencing objections, and, in considering Brazil's relevant conduct, held that Bowden's testimony established by a preponderance of the evidence that Brazil was responsible for 20.1 kilograms of powder cocaine and 12.2 kiograms of crack cocaine. Using this figure, and applying both the sentencing increase for Brazil's role and the penalty enhancement for Brazil's prior state conviction, the court sentenced Brazil to two concurrent 380-month terms.

This appeal followed.

**II.**

Brazil's first argument is that the government violated his right to due process by failing to

disclose information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). While alleged

violations of *Brady* would ordinarily be reviewed *de novo*, *see, e.g.*, *Cone v. Bell*, 129 S. Ct. 1769,

1784 (2009), as Brazil in this case had the opportunity to object at trial and failed to do so, the

government argues that we should review for plain error. Plain error review involves four prongs:

> First, there must be an error or defect – some sort of "[d]eviation from a legal rule"
> – that has not been intentionally relinquished or abandoned . . . . Second, the legal
> error must be clear or obvious, rather than subject to reasonable dispute. Third, the
> error must have affected the appellant's substantial rights, which in the ordinary case
> means he must demonstrate that it "affected the outcome of the district court
> proceedings."

*Puckett v. United States*, --- U.S. ----, 129 S.Ct. 1423, 1429 (2009). Fourth, if these three prongs are

satisfied, then the court "has the *discretion* to remedy the error – discretion which ought to be

exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial

proceedings.'" *Id.* (emphasis in original). Ultimately, however, either de novo or plain error review

yields the same results. As the prosecution provided the material in question in the fashion

prescribed by the Jenks Act, 18 U.S.C. § 3500, the prosecution did not violate Brazil's due process

rights and that the district court therefore committed no error.

Brazil alleges that the prosecution committed a *Brady* violation by failing to disclose, in a

timely fashion, the statement of Willie Jackson taken by Bowden on September 15, 2008 (the day

before the trial started). Brazil maintains in part that this statement demonstrates that law

enforcement knew that Dancey was continuing to engage in unauthorized side drug sales through

at least October of 2007 – despite the fact that Bowden had suggested in his testimony that Dancey had stopped all unauthorized sales in May of 2007. The prosecution provided a full transcript of Jackson's statement to the defense on September 19, 2008, the third day of trial, just before Jackson testified but after testimony from Woodard, Sommers, and Bowden. Having received this material, Brazil's attorney stated for this record his objections to the constitutionality of the Jencks Act, but added that "under the current state of the law and the constitutionality of the Jenks Act, the United States Attorney has complied fully with the law as it now stands." (Trial Tr. III:2-3.)

As the Supreme Court concluded in *Brady*, 373 U.S. at 87, "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material under *Brady* "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 129 S. Ct. at 1783 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). *Brady* also applies in the context of non-disclosure of evidence which impacts upon the credibility "of a witness whose 'reliability may . . . be determinative of guilt or innocence.'" *United States v. Kuehne*, 547 F.3d 667, 698 (6th Cir. 2008) (quoting *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)).

While Brazil and the government present various arguments regarding whether the Jackson statement constitutes *Brady* material, whether it does is ultimately irrelevant, because the government in providing the statement to the defense before Jackson testified complied fully with the requirements of the Jenks Act, 18 U.S.C. § 3500. According to the Jencks Act:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(a)-(b). The term "statement" includes any "transcription . . . which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." *Id*. at § 3500(e)(2). The transcript of Bowden's interview with Jackson, a testifying witness, was clearly within the ambit of the Act.

As we have stated repeatedly, "[w]hen *Brady* material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (quoting *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994)). "If impeachment evidence is within the ambit of the Jencks Act, then the express provisions of the Jencks Act control discovery of that kind of evidence. . . . the government may not be compelled to disclose Jencks Act material before trial." *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988). Put another way: the Jenks Act trumps *Brady* where impeachment evidence

is Jencks Act material. As the *Bencs* court noted, "*Presser* discounted the likelihood that a defendant could be prejudiced by the production of witness statements during trial, as permitted by the Jencks Act, noting that even the *Brady* doctrine requires only the production of material in time for its effective use at trial." *Bencs*, 28 F.3d at 561.

The Jackson statement clearly fell within the ambit of the Jencks Act, and so was not subject to compelled disclosure – even if it was *Brady* material – prior to Jackson's testimony.[3] Accordingly, we find that the prosecution in producing the Jackson statement did nothing to violate Brazil's due process rights and that the district court therefore committed no error.

### III.

Brazil's second argument is that the district court violated his Sixth Amendment right to confront witnesses as recognized in *Crawford v. Washington*, 541 U.S. 36 (2004), by permitting Bowden to testify regarding statements allegedly made by Dancey, who himself did not testify and

---

[3]Even if the statement were not Jencks Act material, moreover, Brazil would be unable to demonstrate a *Brady* violation because he can not demonstrate prejudice. *See Strickler*, 527 U.S. at 281-82. "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *Kuehne*, 547 F.3d at 698 (quoting *Bencs*, 28 F.3d at 560-61). "[A] 'delay only violates *Brady* when the delay itself causes prejudice.'" *Id.* Here, Brazil maintains that the government's production of the statement on the third day of trial hampered his ability to cross-examine other witnesses, including Bowden. Following production of the statement, however, Brazil had the opportunity to ask the court to recall Bowden, but chose not to do so. The Sixth Circuit has routinely recognized that permitting the defense to recall a witness for cross-examination can cure prejudice caused by the delayed production of *Brady* or Jencks Act material. *See, e.g., Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006); *United States v. Blackwell*, 459 F.3d 739, 759 (6th Cir. 2006) (holding that, where defendant was granted an opportunity to re-cross examine a witness after defendant received *Brady* documents following the testimony of the witness, "any prejudice resulting from Defendant's failure to [re-cross examine the witness] is not attributable to the government's violation of the principles set forth in *Brady*"); *United States v. Spry*, 238 F. App'x 142, 148-49 (6th Cir. 2007).

was not subject to cross-examination.  Brazil objects to two statements to which Bowden testified: the first was Dancey's statement that a message Dancey left on Brazil's voicemail stating that Dancey wanted to buy Brazil's car for $3,000 was code for wanting to buy $3,000 worth of drugs; the second was Dancey's response when accused by Bowden in May of 2007 of dealing drugs on the side.  Confrontation Clause issues are reviewed *de novo*, *United States v. Powers*, 500 F.3d 500, 504 (6th Cir. 2007), and are subject to harmless error analysis, *United States v. Martinez*, 588 F.3d 301, 313 (6th Cir. 2009).  On direct criminal appeal, a Confrontation Clause violation is harmless only if the court is able to declare a belief that the violation was harmless "beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)*; Chapman v. California*, 386 U.S. 18, 24 (1967).

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts.  These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684; *see also Earhart v. Konteh*, 589 F.3d 337, 345 (6th Cir. 2009).

The Confrontation Clause of the Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  In 2004, the Supreme Court concluded that the Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54.  "To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature, and must be hearsay." *United States v. Deitz*, 577 F.3d 672, 683 (6th Cir. 2009).  A statement is

testimonial where a reasonable person would anticipate that his or her statement would be used "against the accused in investigating and prosecuting the crime." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

###### A. Dancey's Statements Regarding the "Car for Sale"

Brazil maintains the district court violated his Sixth Amendment rights by permitting Bowden to testify regarding Dancey's statement that a voicemail message Dancey left for Brazil regarding wanting to buy Brazil's car for $3000 was in fact code for wanting to buy $3000 worth of drugs. As the district court ultimately (but not initially) recognized, Bowden's testimony was testimonial hearsay. The Sixth Circuit has held that "statements of . . . confidential informant[s] are testimonial in nature, and therefore may not be offered by the government to establish the guilt of an accused absent an opportunity for the accused to cross-examine the informant." *Cromer*, 389 F.3d at 670-71; *see also Deitz*, 577 F.3d at 683 ("[T]he fact that the declarant was a confidential informant makes his statements testimonial . . . ."). In this instance, moreover, the statement was offered to prove the truth of the matter asserted: that the message Dancey left for Brazil was in fact a coded part of one of the controlled drug purchases. While the district court initially ruled in response to a defense objection that the statement was admissible to explain context, the court changed its mind the next day. Upon convening for the second day of trial, the court stated:

> [Y]ou heard testimony from Sergeant Woodard regarding a conversation that took place with Thomas Dancey on or about September 28, 2007. Part of that conversation involved a voice message to the defendant from Mr. Dancey indicating that Mr. Dancey wanted to buy a car for $3,000. Sergeant Woodard, over an objection that was raised, was allowed to testify regarding Mr. Dancey's explanation of that phrase.

> I want to change my ruling on that particular issue. I'm not going to allow that portion, Sergeant Woodard's testimony concerning the explanation that was given by Mr. Dancey into evidence. I direct that that testimony be stricken, and you should not consider that evidence admitted in the case.

(Trial Tr. II:3.)

Given that Bowden's statement was testimonial hearsay, the court clearly erred in initially admitting Bowden's testimonial hearsay; any violation of the Confrontation Clause was rendered harmless, however, by the fact that the evidence against Brazil was so strong that he would have been convicted even if the statements had not been admitted. *Cf. United States v. Lawson*, 535 F.3d 434, 439 n.1 (6th Cir. 2008) (finding a Confrontation Clause error harmless on direct appeal where the evidence of the defendant's guilt was overwhelming). In addition to direct testimony from Woodard, Sommers, Bowden, and Wade regarding the controlled purchases Dancey made from Brazil, the prosecution presented audio recordings of negotiations between Dancey and Brazil for drugs, a video of the drug distributions from Jackson and Brazil to Dancey on September 13, 2007, and a video of the controlled purchase on October 1, 2007, with a scene of Brazil wiping a package off on his shirt before handing it to Dancey. The prosecution also presented the testimony of Willie Jackson, Brazil's associate, who confirmed that Brazil had sold Dancey the drugs described in the two relevant counts of the superceding indictment. On top of this overwhelming evidence of Brazil's guilt, moreover, the jury heard the court issue a limiting instruction.

Accordingly, we find that, while the district court permitted the jury to hear testimonial hearsay in violation of the Sixth Amendment, as the district court sought to cure the error with a

limiting instruction and as the prosecution presented overwhelming evidence of Brazil's guilt, the

district court's error was harmless beyond a reasonable doubt.

### B. Dancey's Statements Regarding Unauthorized Drug Sales

Brazil also maintains the district court violated his Sixth Amendment rights by permitting

Bowden to testify regarding Dancey's statements made after Bowden challenged Dancey and

accused Dancey in May of 2007 of selling drugs on the side.  It is not entirely clear to what aspect

of Bowden's testimony Brazil is objecting.  He writes: "[Bowden] testified that Dancey, while

initially nervous and upset, calmed down and gave full information.  He testified that Dancey made

a few bucks as a middle man in transactions to keep his story up and that police made cases against

the three people he dealt with."  (Brazil Br. at 33.)  In other words, Brazil seems to be objecting to

any testimony regarding Dancey's responses when accused of making unauthorized sales.

While the statements of confidential informants are always testimonial, "[t]he Confrontation

Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth

of the matter asserted.'" *Deitz*, 577 F.3d at 676 (quoting *Crawford*, 541 U.S. at 59 n.9).  "[E]vidence

that is 'provided merely by way of background' or is offered only to 'explain[ ] how certain events

came to pass or why the officers took the actions they did,' is not offered for the truth of the matter

asserted." *United States v. Warman*, 578 F.3d 320, 346 (6th Cir. 2009) (quoting *Cromer*, 389 F.3d

at 676).  In *United States v. Gibbs*, 506 F.3d 479, 486-87 (6th Cir. 2007), moreover, we found no

*Crawford* violation because the challenged testimony "[d]id not bear on" any element of the charges

against the defendant and "was a miniscule part of [the witness's] overall testimony."  Here, Bowden

testified about Dancey's responses to explain how he and the other law enforcement personnel

investigating the Sunnyside Gang addressed their concerns that Dancey was making unauthorized

drug deals and to describe the measures the team took to ensure the security of its controlled

purchases. The defense, moreover, had already questioned Woodard at length on exactly this

question, of what Dancey said when confronted about making unauthorized drug deals.

As Dancey's unauthorized drug dealing in May of 2007 had little relevance to Brazil's sale

of drugs to Dancey in September and October of 2007, we find that Bowden's testimony did not bear

on any element of the charges, was a minuscule part of Bowden's overall testimony, and therefore

was not offered for the truth of the matter asserted. Accordingly, we find that admission of this

testimony did not violate the Confrontation Clause.

## IV.

Brazil's next argument is that he "was denied due process of law by the use of the

confidential informant against him, failure to properly monitor the controlled purchases, and

improper bolstering the informant and purchases he conducted." (Brazil Br. at 35.) The government

suggests that Brazil is actually making three arguments: (1) sufficiency of the evidence; (2) improper

bolstering; and (3) a reassertion of the *Brady* claim. In fact, Brazil is making only two arguments:

(1) denial of due process premised on a *Brady* violation; and (2) improper bolstering.[4] We have

addressed the due process claim at length,[5] and it remains only for us to address his bolstering claim.

Brazil argues that prosecution improperly bolstered Dancey's credibility, especially through

Bowden's testimony. "Bolstering occurs when the prosecutor implies that the witness's testimony

is corroborated by evidence known to the government but not known to the jury." *United States v.*

*Francis*, 170 F.3d 546, 551 (6th Cir. 1999).[6] In order to avoid bolstering, "if a prosecutor asks a

government agent whether the agent was able to corroborate information provided by an informant,

the prosecutor must introduce to the jury how that information was corroborated." *United States v.*

---

[4]Rather than making a sufficiency of the evidence claim, Brazil is simply re-presenting the evidence and arguing that the jury should have decided the case differently. Even if Brazil is making a sufficiency claim, moreover, his argument clearly fails. On appeal from a criminal conviction, we ask "whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jenkins*, 593 F.3d 480, 483 (6th Cir. 2010). As we stated previously, the prosecution here presented overwhelming evidence of Brazil's guilt.

[5] Brazil appears to think that there is some distinction between his earlier *Brady* argument and a "due process" argument premised on "the fact that the United States Attorney then did not present Dancey to allow cross examination of him" and on the timing of the government's production of the Jackson statement. (Brazil Br. at 39.) Brazil cites no authority for the premise that the government violates due process when it fails to produce a confidential informant for cross-examination at trial; indeed, there is no requirement that the prosecution call such an informant to testify. Brazil's second premise is, as the government argues, simply a restatement of his initial *Brady* claim, which is fully addressed by our discussion of the Jencks Act.

[6]While defendants usually allege that the prosecution has bolstered the testimony of a witness, in this case Brazil seems to be arguing that the prosecution "bolstered the use of Dancey", who did not testify, or of the purchases themselves. Brazil cites no authority for the proposition that a prosecutor even *could* bolster the credibility of a non-testifying confidential informant or of controlled drug purchases. Brazil must instead presumably be arguing that the prosecution bolstered Bowden's testimony *regarding* Dancey and the controlled purchases.

*Martinez*, 253 F.3d 251, 254 (6th Cir. 2001). Where, as here, a defendant makes no objection at trial

to prosecutorial misconduct, we review for plain error. *United States v. Henry*, 545 F.3d 367, 376

(6th Cir. 2008).

At trial, Bowden testified extensively on both direct and cross-examination regarding

Dancey's role in the investigation of the Sunnyside Gang. Bowden testified, for example, that he

had worked with Dancey almost daily between April and October of 2007, during which time

Dancey made a total of 40 controlled purchases. Bowden also testified regarding Dancey's response

when Bowden confronted Dancey in May of 2007 about Dancey's unauthorized selling of drugs.

Brazil now argues that "[t]he entire line of questioning of Bowden concerning corroborating the use

of Dancey was improper bolstering implying corroboration from the extent of the investigation and

use of the informant in other transactions without providing those transactions on the record."

(Brazil Br. at 38.) For this proposition, Brazil cites *Martinez*, 253 F.3d at 253, in which we found

that a prosecutor had improperly bolstered the testimony of the prosecution's main witness by

soliciting from a testifying narcotics deputy the unsupported and uncorroborated statement that "the

information [the witness has] provided has always been credible, it's been accurate and truthful."

*Martinez*, however, is clearly distinguishable: in this case, neither the prosecution nor Bowden ever

suggested that Dancey's credibility had been demonstrated by evidence not known to the jury. If

anything, by testifying regarding Dancey's unauthorized dealing, Bowden *detracted* from Dancey's

credibility and trustworthiness. The fact that Dancey participated in 40 controlled purchases,

moreover, says nothing about Dancey's credibility or the truth of Bowden's testimony – only the

extent of Bowden's interactions with Dancey.

As Brazil has not identified any way in which the prosecutor implied that Bowden's testimony was corroborated by evidence not known to the jury, we find that the prosecution did not improperly bolster Bowden's testimony or Dancey's credibility.[7]

**IV.**

Brazil's fourth argument is that his trial counsel rendered ineffective assistance by raising an entrapment defense and so opening the door to detrimental testimony from Roxie Burton regarding Brazil's predisposition to engage in drug trafficking. To demonstrate that his counsel's performance was constitutionally deficient, Brazil must show that it "fell below an objective standard of reasonableness" and that it prejudiced the defense. *Strickland v. Washington*, 466 U.S. 688, 688-89 (1984). Such a claim is ordinarily deferred until post-conviction proceedings under 28 U.S.C. § 2255, when an evidentiary hearing can be held to ascertain whether counsel's conduct was motivated by sound strategy. *See Warman*, 578 F.3d at 348 ("As a general rule, a defendant may not raise ineffective-assistance-of-counsel claims for the first time on direct appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the

---

[7]Brazil also argues that in examining Bowden the prosecution "engaged in a lengthy presentation to the Jury . . . to parade information concerning facts to bolster and vouch for Dancey in conducting the alleged purchases with Defendant." (Brazil Br. at 40.) While Brazil cites no case law and does not develop this claim, it is possible to read this statement as also making a vouching argument. Improper vouching occurs "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *Francis*, 170 F.3d at 550. Here, Brazil points to no statements made or questions asked by the prosecutor that would fall within this definition. Even had Brazil fully made this argument, then, it would similarly be unavailing.

allegations.") (quoting *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005)). Accordingly, we dismiss this claim; should he choose to do so, Brazil may bring it under 28 U.S.C. § 2255.

## V.

Brazil's fifth argument is that the cumulative effect of the errors he alleges occurred at trial rendered his trial fundamentally unfair. "Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hughes*, 505 F.3d 578, 597-98 (6th Cir. 2007) (quoting *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983)). Except for permitting the jury to hear testimonial hearsay in violation of Brazil's right of confrontation, however – which error we have found harmless in light of the overwhelming evidence of Brazil's guilt presented at trial – the court committed no other error. In other words, Brazil "has failed to identify any other error committed by the district court which could be combined with this harmless error in order to support a finding of cumulative error and which would rise to the level of fundamental unfairness." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) (holding that "a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.")). Accordingly, we find that Brazil's cumulative error argument is unavailing.

## VI.

Brazil's final argument is that the court in sentencing him violated his Sixth Amendment right to a jury trial and to confront the witnesses against him and his Fifth Amendment right against

double jeopardy. We review preserved constitutional challenges to sentencing *de novo*. *See United States v. Johnson*, 440 F.3d 832, 847 (6th Cir. 2006).

### A. Right to a Jury Trial

Brazil argues first that the district court at sentencing violated his Sixth Amendment right to a jury trial as recognized in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Instead of holding Brazil responsible only for the 128.12 grams involved in the transactions for which he was convicted, the court, in considering what "relevant conduct" to take into account and after hearing additional testimony from Bowden, ultimately held Brazil accountable for trafficking in 12.2 kilograms of crack cocaine and 20.1 kilograms of powder cocaine. Brazil maintains that the court was in effect circumventing the basic requirement that "facts that *must* be found in order for a sentence to be lawful . . . must be found by the jury beyond a reasonable doubt in order to give intelligible content to the right of jury trial." *See Rita v. United States*, 551 U.S. 338, 373 (2007) (Scalia, J. concurring).

Brazil's argument is premised upon a misunderstanding of *Apprendi*. According to the *Apprendi* Court, "[o]ther than the fact of a prior conviction, any fact *that increases the penalty for a crime beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (emphasis added). As the Supreme Court observed in 2007, moreover, the Sixth Amendment is not violated so long as judicial fact-finding did not result in a sentence greater than the maximum established by plea or verdict. *Rita*, 551 U.S. at 352 ("The Sixth Amendment question . . . is whether the law *forbids* a judge to increase a defendant's sentence unless the judge finds facts that the jury did not find (and the offender did not concede).").

The jury found Brazil guilty of two counts of trafficking in more than 50 grams of cocaine base; the statutory maximum for either count is life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A)(iii). The court's fact-finding (which supported concurrent 380-month sentences) thus did not increase Brazil's penalty beyond the statutory maximum, *see Apprendi*, 530 U.S. at 490, and so the court did not violate Brazil's Sixth Amendment right to a jury trial.

## B. Right to Confront Witnesses

Brazil argues that, by permitting Bowden to testify at the sentencing hearing regarding summaries of what various individuals had said regarding Brazil's past drug trafficking activities, the district court deprived Brazil of his Sixth Amendment right to confront the witnesses against him in violation of *Crawford*, 541 U.S. 36. As we have repeatedly held, however, "confrontation rights do not apply in sentencing hearings as at a trial on the question of guilt or innocence. . . . [S]entencing does not mandate confrontation and cross-examination on information submitted to the court through the presentence reports and law enforcement sources." *United States v. Silverman*, 976 F.2d 1502, 1510 (6th Cir. 1992) (*en banc*); *see also United States v. Brika,* 487 F.3d 450, 457 (6th Cir. 2007) ("[N]either the rules of evidence nor the right to confront witnesses applies at sentencing.") (citing *United States v. Katzopoulos*, 437 F.3d 569 (6th Cir. 2006)). The court identified this rule at the beginning of the sentencing hearing, and, following Bowden's testimony, made the necessary independent determination that Bowden's statements had at least the necessary "minimum indicia of reliability" to permit their use in determining relevant conduct. As Bowden had no confrontation rights at sentencing, the court necessarily did not violate them.

## C. Right against Double Jeopardy

Brazil maintains that, in enhancing his sentence pursuant to 21 U.S.C. § 851 on the basis of

a prior 1998 drug conviction, the district court violated his Fifth Amendment right against double

jeopardy because the conduct that led to that conviction "was precisely the conduct upon which the

Government chose to dismiss" the conspiracy charge in Count I of the indictment. (Brazil Br. at

47.)[8] Brazil specifically maintains the court's use of the 1998 conviction, "which occurred during

the course of the conduct alleged against Defendant in the dismissed Count and not prior thereto, is

barred by the prohibition against multiple punishments for the same offense." (Brazil Br. at 47-48.)

While Brazil is certainly correct that a defendant may not be punished twice for committing

the same offense, Brazil's argument is without merit. "It is well established that prior convictions

can be used to enhance a defendant's sentence" without implicating the Double Jeopardy Clause.

*United States v. Flowal*, 163 F.3d 956, 963 (6th Cir. 1998). In 1998, Brazil was convicted in the

10th Judicial Circuit of Michigan for possession of less than 25 grams of cocaine. As the sentencing

transcripts make clear (and as Brazil's lawyer conceded), in determining that Brazil should be held

---

[8]Brazil's double jeopardy argument is premised upon the belief that the conspiracy charge in Count 1 was not dismissed until after jeopardy had attached. While the court signed the order granting the government's motion to dismiss on September 23, 2008 (following the verdict), however, the district court clearly believed that it had dismissed this charge prior to trial. (*See* 4/13/09 Sentencing Tr. R. 245 at 21 ("I would also advance the additional rationale that in this instance I do not believe that the double jeopardy provisions furnish the defendant with additional argument to the extent that Count One was indeed dismissed before the jury was assembled.").) It also seems clear that the parties also understood, prior to trial, that Count 1 had been dismissed. In its opening statement, for example, the prosecution stated that, "[a]s we talked about before, the defendant is charged in counts 19 and 21 of the indictment. . . . Do not concern yourself with what happened in 1 through 18 or 21 through 26, that has no bearing on this case." (Trial Tr. I:2-3.) In the final, agreed-to, jury instructions, moreover, the court only discussed Counts 19 and 21, and provided no instruction as to Count 1.

accountable for 12.2 kilograms in this case, the district court did not include in its calculations the cocaine that formed the basis of the 1998 conviction. Nor, for that matter, did the court base its relevant conduct determination on the dismissed conspiracy count: instead, the court based its determination on evidence of specific drug transactions between Brazil and five cooperating defendants, none of whom were charged or even mentioned in the dismissed count.

That Brazil was convicted of possessing drugs during a period during which he also (according to the dismissed Count 1) engaged in a conspiracy with nine others to sell drugs is not dispositive to the double jeopardy question. In *United States v. Hughes*, 924 F.2d 1354, 1358 (6th Cir. 1991), for example, we rejected a similar argument, in which a defendant maintained that the district court could not consider a prior state drug conviction in sentencing "since the facts surrounding his previous state conviction occurred during the course of the conspiracy to which he pled guilty in the instant case." We observed:

> [A]t the time of his offense, Hughes had a prior felony drug conviction which arose from a separate criminal episode . . . . An episode is an incident that is part of a series, but forms a separate unit within the whole. Although related to the entire course of events, an episode is a punctuated occurrence with a limited duration. The criminal events that constitute the bases for Hughes' conviction for possession of cocaine and his subsequent conviction for conspiracy do not represent a single criminal episode.

*Id.* at 1361-62. Here, similarly, even if jeopardy attached to the dismissed count of conspiracy, Brazil's 1998 conviction arose from a separate criminal episode, and was not otherwise factored into the district court's relevant conduct determination.

Accordingly, we find that the district court did not subject Brazil to double jeopardy by enhancing his sentence in light of his prior conviction for drug possession.

**VII.**

While Brazil is correct that the district court committed an error at trial – initially permitting the jury to hear testimonial hearsay before ultimately issuing a limiting instruction – that error was clearly harmless in light of the overwhelming evidence of guilt that the prosecution presented through the testimony of law enforcement personnel and Brazil's own associate and through video and audio recordings of Brazil participating in drug sales. Despite his arguments regarding his sentencing, moreover, the district court committed no error in hearing additional testimony from Bowden regarding relevant conduct and in enhancing Brazil's sentence on the basis of a prior conviction for drug possession. Accordingly, we **AFFIRM** the conviction and sentence.